**NEW ERA PUBLICATIONS INTERNA-
TIONAL, ApS,
Plaintiff–Appellee/Cross–Appellant,**

v.

**CAROL PUBLISHING GROUP,
Defendant–Appellant/Cross–Appellee.**

Nos. 1204–1376, Dockets
90–7181, 90–7193.

United States Court of Appeals,
Second Circuit.

Argued April 2, 1990.

Decided May 24, 1990.

Melvin L. Wulf, New York City (Beldock Levine & Hoffman, of counsel), for Defendant–Appellant, Cross–Appellee.

Michael Lee Hertzberg, New York City (Rabinowitz, Boudin, Standard Krinsky & Lieberman, P.C., Eric M. Lieberman, David M. Golove, Jonathan W. Lubell, of counsel), for Plaintiff–Appellee, Cross–Appellant.

Before FEINBERG, PRATT and WALKER, Circuit Judges.

FEINBERG, Circuit Judge:

Defendant Carol Publishing Group appeals from a February 13, 1990 judgment of the United States District Court for the Southern District of New York, Louis L. Stanton, J., permanently enjoining it from publishing a biography in its present form, on grounds of copyright infringement. In an opinion reported at 729 F.Supp. 992, the district court held that the biography's quotations from its subject's writings—all of which had been published—did not constitute "fair use" under 17 U.S.C. § 107, and that the copyright on one of the works quoted from had expired. We disagree with the former conclusion but agree with the latter, and thus reverse in part and affirm in part.

## Background

The biography at issue in this appeal is entitled *A Piece of Blue Sky: Scientology, Dianetics and L. Ron Hubbard Exposed,* and was written by Jonathan Caven–Atack. (We will refer to *A Piece of Blue Sky* as "the book" and to Caven–Atack as "the author.") The subject of the book is L. Ron Hubbard, the controversial founder of the Church of Scientology (the Church), who died in 1986.

The author joined the Church when he was 19 and was a member for almost nine years. In 1983, however, according to the author, his faith in the Church was shaken by what he saw as the Church's repressive practices toward dissident members. The author subsequently resigned from the Church, but undertook a thorough investigation into the Church and Hubbard. During the course of this inquiry, the author became convinced that the Church was a dangerous cult, and that Hubbard was a vindictive and profoundly disturbed man.

The author's investigation culminated in the book, which, in its present manuscript form, is 527 double-spaced pages in length. As its title makes plain, the book is an unfavorable biography of Hubbard and a strong attack on Scientology; the author's purpose is to expose what he believes is the pernicious nature of the Church and the deceit that is the foundation of its teachings. The book paints a highly unflattering portrait of Hubbard as a thoroughgoing charlatan who lied relentlessly about his accomplishments. The author's attitude toward his subject can be gauged by his descriptions of Hubbard as "an arrogant, amoral egomaniac," "a paranoid, power hungry, petty sadist," and—perhaps ironically in light of the claims in this case —"an outright plagiarist." [1] The book quotes widely from Hubbard's works, using passages from Hubbard's writings both in the body of the text and at the beginning of many chapters. The author had a rich vein of material to mine, because Hubbard wrote prolifically on a wide variety of subjects, including science fiction, philosophy and religion. We are informed that Hubbard published nearly 600 fiction and non-fiction works during his lifetime, 111 of which are in print.

Plaintiff-appellee/cross-appellant New Era Publications International, ApS is the exclusive licensee of Hubbard's works. After learning that appellant Carol Publishing Group intended to publish the book, appellee sued appellant in the district court. (Although appellee named the author as a defendant, it did not serve him with a summons and complaint, and he has never entered an appearance.) Appellee claimed that the book copied "substantial portions" of certain of Hubbard's works in violation of its exclusive copyright rights under 17 U.S.C. § 106, and accused appellant of willful copyright infringement under 17 U.S.C. §§ 106 and 501. In particular, appellee argued that 121 passages of the book were drawn from 48 of Hubbard's works. The complaint sought, among other things, an injunction to stop publication of the book. Appellee subsequently moved for a temporary restraining order and a preliminary injunction; by stipulation, the proceedings for a permanent and for a preliminary injunction were later merged.

The district court granted a permanent injunction. It held, first, that the copyright had expired on one of the works quoted in the book, the *HCO Manual of Justice*. 729 F.Supp. at 995. The court then went on to determine whether the book's use of passages from Hubbard's other works was protected "fair use" under 17 U.S.C. § 107, which is reproduced in the margin.[2] Id. at 995–1001. The district court analyzed the four factors spelled out in § 107, and found that factor one (purpose and character of the use) "strongly" favored appellee, be-

---

1. We note here what should be obvious but nevertheless bears stating. We express no view of our own as to Hubbard, his teachings or the Church. The unflattering characterizations are those of the author of the book.

2. Section 107 provides that:
   Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.

In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
   (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
   (2) the nature of the copyrighted work;
   (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
   (4) the effect of the use upon the potential market for or value of the copyrighted work.

cause "many of the passages lack any allowable fair use purpose," id. at 998; factor two (nature of the copyrighted work) favored appellee since "so many" of the quoted passages "are expressive rather than factual," id. at 999; factor three (amount used in relation to copyrighted work as a whole) also favored appellee, because the quoted passages amount to a "small, but significant element of" the book, id. at 1000; and that factor four (effect of use on the market for the copyrighted work) did not favor either party. Id. at 1001. The district court thus concluded that appellee was entitled to a permanent injunction against publication of the book in its present form, noting that "[t]he book is still in manuscript form, so deletion of the infringing passages will be relatively simple and inexpensive." Id. at 1001. The district court thereafter entered judgment, listing 103 infringing passages taken from 43 works, all published.

Appellant now appeals from the judgment granting an injunction, and appellee cross-appeals from the district court's determination that the copyright on the *HCO Manual* had expired.

### Discussion

1. *Fair Use*

■ Appellant asserts that, contrary to the district court's view, all four fair use factors referred to in § 107 weigh in its favor, while appellee argues to the contrary. At the outset, we note that § 107 "requires a case-by-case determination whether a particular use is fair." *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 549, 105 S.Ct. 2218, 2225, 85 L.Ed.2d 588 (1985). Furthermore, fair use is a mixed question of law and fact, id. at 560, 105 S.Ct. at 2230, and thus the district court's conclusion on this point is open to full review on appeal. See *Puma Indus. Consulting, Inc. v. Daal Assocs., Inc.*, 808 F.2d 982, 986 (2d Cir.1987). And, "[w]here the district court has found facts sufficient to evaluate each of the statutory factors, an appellate court 'need not remand for further factfinding,'" but may resolve the issue of fair use as a

matter of law. *Harper & Row*, 471 U.S. at 560, 105 S.Ct. at 2230 (quoting *Pacific & Southern Co. v. Duncan*, 744 F.2d 1490, 1495 n. 8 (11th Cir.1984), cert. denied, 471 U.S. 1004, 105 S.Ct. 1867, 85 L.Ed.2d 161 (1985)).

In addition, the structure of § 107 is significant. The section is entitled "Limitations on exclusive rights: Fair use," and the opening sentence makes clear that a "fair use ... is not an infringement of copyright." The same sentence furnishes examples of broad categories of fair use: "criticism, comment, news reporting, teaching ..., scholarship or research." The section then defines four non-exclusive factors to be considered in determining whether a particular use is fair.

We have quite recently applied the doctrine of fair use in two opinions of this court. See *Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir.), cert. denied, 484 U.S. 890, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987); *New Era Publications Int'l, ApS v. Henry Holt & Co.*, 873 F.2d 576 (2d Cir.), petition for reh'g denied, 884 F.2d 659 (2d Cir.1989), cert. denied, —— U.S. ——, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990). Since the decisions in *Salinger* and *New Era*, there have been a number of articles on the subject of fair use. See, e.g., Weinreb, Fair's Fair: A Comment on the Fair Use Doctrine, 103 Harv.L.Rev. 1137 (1990). Indeed, several of the articles have been written by some of the judges involved in those decisions. See Oakes, Copyrights and Copyremedies: Unfair Use and Injunctions, to be published in a forthcoming edition of the Hofstra L.Rev.; Leval, Commentary: Toward a Fair Use Standard, 103 Harv.L.Rev. 1105 (1990); Miner, Exploiting Stolen Text: Fair Use or Foul Play?, 37 J. Copyright Soc'y 1 (1989); Newman, Not the End of History: The Second Circuit Struggles with Fair Use, 37 J. Copyright Soc'y 12 (1989). Some of these articles are highly critical of the state of the law with respect to the fair use doctrine and offer suggestions for improvement. But, our task is to apply as best we can the teachings of the governing precedents as we understand them. In doing so, on the facts before us and under the

appropriate wide-ranging standard of review, we conclude that all four factors listed in § 107 favor appellant, and that appellant's use was fair.

### A. Factor One: Purpose and Character of the Use

■ As noted above, the book is an unfavorable biography. Section 107 provides that use of copyrighted materials for "purposes such as criticism, ... scholarship, or research, is not an infringement of copyright." Our cases establish that biographies in general, and critical biographies in particular, fit "comfortably within" these statutory categories "of uses illustrative of uses that can be fair." *Salinger,* 811 F.2d at 96; see also *New Era,* 873 F.2d at 583.

■ Citing *Harper & Row,* 471 U.S. at 561, 105 S.Ct. at 2231, appellee argues that there is no rule that if an allegedly infringing work is a biography, factor one necessarily operates in the biographer's favor in evaluating whether there has been a "fair use." Nevertheless, "[i]f a book falls into one of these categories [i.e., criticism, scholarship or research], assessment of the first fair use factor should be at an end." *New Era,* 884 F.2d at 661 (Miner, J., concurring in the denial of rehearing in banc). True, the Supreme Court in *Harper & Row* did not end its analysis of factor one once it had determined that the allegedly infringing use (news reporting) was listed in § 107 as an example of fair use. See 471 U.S. at 561–63, 105 S.Ct. at 2230–32. However, what the Court went on to consider was the infringer's knowing exploitation of the copyrighted material—obtained in an underhanded manner—for an undeserved economic profit. See id. at 562–63, 105 S.Ct. at 2231–32. The present case, by contrast, does not involve "an attempt to rush to the market just ahead of the copyright holder's imminent publication, as occurred in *Harper & Row.*" *Salinger,* 811 F.2d at 96. Instead, as the author explained in detail in an affidavit submitted below, discussing the reason why he included each quote, the author uses Hubbard's works for the entirely legitimate purpose of making his point that Hubbard was a charlatan and the Church a dangerous cult. To be sure, the author and appellant want to make a profit in publishing the book. But the author's use of material "to enrich" his biography is protected fair use, "notwithstanding that he and his publisher anticipate profits." *Id.*

■ Appellee also contends that the book's use of Hubbard's works does not serve any fair use purpose, but was rather unnecessary appropriation of Hubbard's literary expression. We do not agree with this characterization. The author uses the quotations in part to convey the facts contained therein, and not for their expression. More importantly, even passages used for their expression are intended to convey the author's perception of Hubbard's hypocrisy and pomposity, qualities that may best (or only) be revealed through direct quotation. The book "is not merely the product of 'the facile use of the scissors.'" *Maxtone-Graham v. Burtchaell,* 803 F.2d 1253, 1260 (2d Cir.1986) (quoting *Folsom v. Marsh,* 9 F.Cas. 342, 345 (C.C.D.Mass.1841) (No. 4901) (Story, J.)), cert. denied, 481 U.S. 1059, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987). Appellee points particularly to the 17 topic quotations that begin many of the chapters; while a few of these may arguably come close to the line separating critical study from appropriation, most do not. Indeed, even this borderline use appears to serve the author's purpose by juxtaposing the grandiose expression of the quotations with the banal (to the author) material contained in the body of the chapter. Moreover, the topic quotations sometimes serve to explain or to summarize matters discussed in the chapter.

Appellee further argues that *New Era* explicitly held that copying for purposes of demonstrating character defects cannot amount to fair use. This is simply a misreading of *New Era.* The passage that appellee cites in support of its interpretation, 873 F.2d at 583, does not reject the idea that quotation in a biography to demonstrate character flaws may be fair use. Rather, the passage rejects the claim that the purpose of the use entitles it to "special

consideration." *Id.;* see also *New Era*, 884 F.2d at 660–61 (Miner, J., concurring in the denial of rehearing in banc). The panel in *New Era*, however, observed that "[a]s long as a book can be classified as a work of criticism, scholarship or research, as can the book here, the factor cuts in favor of the book's publisher, whether the copyrighted matter is taken from a literary lion like J.D. Salinger or a purported prophet like L. Ron Hubbard." *New Era*, 873 F.2d at 583.

We hold that factor one favors appellant.

B. Factor Two: Nature of the Copyrighted Work

■ The district court found that all of the works from which the author quoted had been published. 729 F.Supp. at 998. Whether or not a work is published is critical to its nature under factor two, because "the scope of fair use is narrower with respect to unpublished works." *Harper & Row*, 471 U.S. at 564, 105 S.Ct. at 2232; see also *New Era*, 873 F.2d at 583; *Salinger*, 811 F.2d at 96. Thus, "even substantial quotations might qualify as fair use in a review of a published work." *Harper & Row*, 471 U.S. at 564, 105 S.Ct. at 2232.

■ Furthermore, the scope of fair use is greater with respect to factual than non-factual works. See id. at 563, 105 S.Ct. at 2232. While there is no bright-line test for distinguishing between these two categories, we have referred to the former as works that are "essentially factual in nature," *Maxtone–Graham*, 803 F.2d at 1263, or "primarily informational rather than creative." *Consumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir.1983), cert. denied, 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984). We have some hesitation in trying to characterize Hubbard's diverse body of writings as solely "factual" or "non-factual," but on balance, we believe that the quoted works—which deal with Hubbard's life, his views on religion, human relations, the Church, etc.—are more properly viewed as factual or informational.

■ Appellee emphasizes, however, that there is no per se rule under *Harper &* *Row, New Era* and *Salinger* that factor two favors an alleged infringer whenever the works quoted from are published, as appellant appears to suggest. Appellee is, of course, correct that there is no rule that one may copy with absolute impunity from a published work, regardless of the amount taken. Otherwise, the copyright law would be a nullity. Nevertheless, Hubbard's works have been published, and "[b]iographies, of course, are fundamentally personal histories and it is both reasonable and customary for biographers to refer to and utilize earlier works dealing with the subject of the work and occasionally to quote directly from such works." *Maxtone–Graham*, 803 F.2d at 1263 (quoting *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir.1966), cert. denied, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967)).

Appellee also contends that *Harper & Row* did not endorse greater copying from published works, arguing that in *Salinger*, we interpreted *Harper & Row* to mean only that the likelihood "that copying will be found to be a fair use is diminished when the copyrighted material is unpublished, not that a greater quantity of copying of published works is permitted." Appellee fails to persuade us, however, that the plain language of the Supreme Court in *Harper & Row*—i.e., "even substantial quotations might qualify as fair use in a review of a published work," 471 U.S. at 564, 105 S.Ct. at 2232—should be disregarded. Furthermore, even assuming that appellee's characterization of *Salinger*'s gloss on this passage is correct, appellee advances no persuasive reason why a court should be less, rather than more, likely to find fair use when, as here, the copyrighted material has been published.

In addition, appellee argues that *Harper & Row* intended to allow liberal quotation only for the purpose of literary criticism or review of published works, and that the book does not purport to analyze the literary worth of Hubbard's works. But, we regard appellee's attempt to limit *Harper & Row* to literary criticism as entirely too literal-minded, particularly in the face of

our cases holding that biographies are considered works of criticism, scholarship or research within the meaning of § 107. See, e.g., *Salinger*, 811 F.2d at 96.

Appellee further asserts that many of the quoted passages are more creative or expressive than factual, and that *Maxtone–Graham* is not relevant here. because that case involved "standard social science source materials"—i.e., quotations drawn from published interviews. We agree, as already indicated, that there is no easy distinction between works that are "factual" on the one hand, and "creative" or "expressive" on the other, because " [c]reation of a nonfiction work, even a compilation of pure fact, entails originality.' " *Maxtone–Graham*, 803 F.2d at 1262–63 (quoting *Harper & Row*, 471 U.S. at 547, 105 S.Ct. at 2224). Thus, reasonable people can disagree over how to classify Hubbard's works. Nevertheless, although some of the quoted passages can accurately be described as expressive— e.g., Hubbard's poetry—our review of the record persuades us that most simply cannot be so characterized.

Finally, appellee distinguishes *Maxtone–Graham*, rightly noting that the case involved quotations from "a collection of verbatim interviews," which the district court there described as " 'essentially reportorial in nature.' " *Maxtone–Graham*, 803 F.2d at 1262. Nevertheless, we see nothing in that case indicating that the panel intended its discussion of factor two to be limited to situations involving such interviews. Indeed, the panel drew its discussion of factor two from an earlier case dealing with biographies, *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir.1966), cert. denied, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967).

We conclude that factor two favors appellant.

### C.  Factor Three:· Volume of Quotation

■  Factor three addresses the amount and substantiality of the portion used in relation to the copyrighted work, not to the allegedly infringing work. *Harper & Row*, 471 U.S. at 564–65, 105 S.Ct. at 2232–33.

"There are no absolute rules as to how much of a copyrighted work may be copied and still be considered a fair use." *Maxtone–Graham*, 803 F.2d at 1263. This factor has both a quantitative and a qualitative component, so that courts have found that use was not fair where the quoted material formed a substantial percentage of the copyrighted work, see, e.g., *Salinger*, 811 F.2d at 98 (factor three favors copyright holder where one-third of 17 letters and 10% of 42 letters used) or where the quoted material was " 'essentially the heart of' " the copyrighted work. *Harper & Row*, 471 U.S. at 565, 105 S.Ct. at 2233 (quoting the district court opinion in that case, 557 F.Supp. 1067, 1072 (D.C.N.Y. 1983)).

■  Here, the book uses overall a small percentage of Hubbard's works. Appellant calculates that the book quotes only a minuscule amount of 25 of the 48 works that appellee claimed were infringed, 5–6% of 12 other works and 8% or more of 11 works, each of the 11 being only a few pages in length. (Appellee has accepted these figures "for purposes of discussion," although it adds that they may understate the true amount taken.) In the context of quotation from published works, where a greater amount of copying is allowed, see *Harper & Row*, 471 U.S. at 564, 105 S.Ct. at 2232, this is not so much as to be unfair. Cf. *Maxtone–Graham*, 803 F.2d at 1263 (inclusion of 4.3% of published copyrighted work "is not incompatible with a finding of fair use"); *Iowa State Univ. Research Found., Inc. v. American Broadcasting Co.*, 621 F.2d 57, 61–62 (2d Cir.1980) (fair use defense not available where broadcast was made containing 8% of a videotape that apparently had never been broadcast before).

Nor is the use qualitatively unfair. Appellee asserts that "key portions" of Hubbard's works are taken "[i]n many cases." But the district court found that the quotations in the book's text—which amount to the bulk of the allegedly infringing passages—do not take essentially the heart of Hubbard's works. 729 F.Supp. at 1000. And our review of the remaining 17 pas-

sages, which are "set off by themselves at the beginning of a part or chapter" and "set the tone for the sections they precede," id. at 996, persuades us that they too do not take essentially the heart of Hubbard's works.

Appellee also argues that factor three weighs in its favor because the quotations are an important ingredient *of the book,* pointing out that 2.7% of the book is made up of quotations from Hubbard's works.[3] Appellee asserts that, because of the length of Hubbard's works and because so many of his writings were quoted from, it would be of little value to focus on the amount of infringing material in relation to the copyrighted works, and cites various cases—e.g., *Harper & Row,* 471 U.S. at 566, 105 S.Ct. at 2233; *Salinger,* 811 F.2d at 98–99; *Meeropol v. Nizer,* 560 F.2d 1061, 1070–71 (2d Cir.1977), cert. denied, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978)—in which courts discussed the amount used in relation to the infringing work, not the infringed work.

▮ We do not agree with appellee's argument. Section 107 plainly commands us to consider "the amount and substantiality of the portion used in relation to *the copyrighted work* as a whole" (emphasis added), and contains no exception for lengthy works or quotations from multiple works. Furthermore, to the extent that courts have looked to the infringing work, the use here is not as significant as the use alleged in those cases. In *Salinger,* for example, the quoted materials "[t]o a large extent ... ma[de] the book worth reading." 811 F.2d at 99; see also *Harper & Row,* 471 U.S. at 565–66, 105 S.Ct. at 2233–34 (quotes constituted 13% of the infringing work and played a "key role" in it); *Meeropol,* 560 F.2d at 1070–71 (quoted material figured prominently in the promotional work for the book). By contrast, the use of the quotes here is primarily a means for illustrating the alleged gap between the official version of Hubbard's life and accomplishments, and what the author contends are the true facts. For that purpose,

some conjuring up of the copyrighted work is necessary. Cf. *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.,* 886 F.2d 490, 497 (2d Cir.1989) (trademark case; parody "must to some extent resemble the original").

We find that factor three favors appellant.

### D. Factor Four: Effect on the Market

Factor four of § 107 concerns the "effect of the use upon the potential market for or value of the copyrighted work." According to the Supreme Court, this "is undoubtedly the single most important element of fair use." *Harper & Row,* 471 U.S. at 566, 105 S.Ct. at 2233 (footnote omitted). In evaluating this factor, courts do not focus solely on the market for the work itself, but also on the "harm to the market for derivative works." Id. at 568, 105 S.Ct. at 2234.

Appellee argues strenuously that factor four favors it, asserting that it intends to publish an authorized biography of Hubbard that will include excerpts from all of his works, including material as yet unpublished, and that the book will discourage potential readers of the authorized biography by conveying the flavor of Hubbard's writings. Appellee also contends that *New Era* leaves us no choice but to rule in its favor on factor four; according to appellee, that case held that publication of a similar unfavorable biography would impair the market for, and compete with, its planned biography of Hubbard.

▮ We do not find either argument persuasive. As to the first, we found it "unthinkable" in *Maxtone–Graham* that potential customers for plaintiff's copyrighted book containing a "series of sympathetic interviews on abortion and adoption" would fail to purchase plaintiff's book because a small portion of it was used in an essay sharply critical of abortion. 803 F.2d at 1264. Similarly, we are skeptical here that potential customers for the authorized *favorable* biography of Hubbard in the fu-

---

**3.** Appellant puts the sum at 2.4% or 2.9%. The difference, however, is not significant to our reasoning, and we will use appellee's figure for the purpose of our discussion.

ture will be deterred from buying because the author's *unfavorable* biography quotes from Hubbard's works. Indeed, it is not "beyond the realm of possibility that" the book "might stimulate further interest" in the authorized biography. Id.

Furthermore, even assuming that the book discourages potential purchasers of the authorized biography, this is not necessarily actionable under the copyright laws. Such potential buyers might be put off because the book persuaded them (as it clearly hopes to) that Hubbard was a charlatan, but the copyright laws do not protect against that sort of injury. Harm to the market for a copyrighted work or its derivatives caused by a "devastating critique" that "diminished sales by convincing the public that the original work was of poor quality" is not "within the scope of copyright protection." *Consumers Union*, 724 F.2d at 1051 (footnote omitted). This is so because the critique and the copyrighted work serve "fundamentally different functions, by virtue" of, among other things, "their opposing viewpoints." *Maxtone–Graham*, 803 F.2d at 1264. "Where the copy does not compete in any way with the original," copyright's central concern— "that creation will be discouraged if demand can be undercut by copiers"—is absent. *Consumers Union*, 724 F.2d at 1051; see also 3 Nimmer on Copyright, § 13.05[B], at 13–90.1 to –90.3 (1989). Here, the purpose of the book is diametrically opposed to that of the authorized biography; the former seeks to unmask Hubbard and the Church, while the latter presumably will be designed to promote public interest in Hubbard and the Church. Thus, even if the book ultimately harms sales of the authorized biography, this would not result from unfair infringement forbidden by the copyright laws, but rather from a convincing work that effectively criticizes Hubbard, the very type of work that the Copyright Act was designed to protect and encourage.

Nor do we believe that *New Era* compels a contrary result. At the outset, we note that the panel in *New Era* did not address in this context the point we have just made, that is, a critical biography serves a different function than does an authorized, favorable biography, and thus injury to the potential market for the favorable biography by the publication of the unfavorable biography does not affect application of factor four. See 873 F.2d at 583. Beyond that, however, *New Era* involved the publication of previously unpublished material, "particularly from [Hubbard's] early diaries and journals." Id. at 578–79. Arguably, then, the unfavorable biography in *New Era* threatened economic harm to the authorized biography, even though it fulfilled a different function, because it contained material whose market value (1) had not yet been realized by the copyright holder, and (2) might be entirely misappropriated by the infringing publication. Here, by contrast, the works quoted from are all published, and the book will not tap any sources of economic profit that would otherwise go to the authorized biography. Cf. *Harper & Row*, 471 U.S. at 562, 567–68, 105 S.Ct. at 2231, 2234 (unpublished work; actual damage of $12,500 shown, and infringing work intended to scoop publication of copyrighted work); *Salinger*, 811 F.2d at 99 (unpublished letters; infringing work "copies virtually all of the most interesting passages of the letters").

We conclude that factor four favors appellant.

### E. Other Factors

The factors enumerated in § 107 "are not meant to be exclusive," *Harper & Row*, 471 U.S. at 560, 105 S.Ct. at 2230, and we have looked to such additional considerations as "bad faith by the user of copyrighted material [that] suggests unfairness," *Maxtone–Graham*, 803 F.2d at 1264, or "prejudice suffered by [the alleged infringer] as the result of [the copyright holder's] unreasonable and inexcusable delay in bringing the action." *New Era*, 873 F.2d at 584. Although appellee argues that the book's use of passages from Hubbard's works was "predatory" rather than fair, we simply do not agree with this characterization, and find that there are no additional factors suggesting unfairness.

In sum, balancing all of the relevant factors, we believe that the present

case presents a strong set of facts for invoking the fair use defense: The book is a critical biography, designed to educate the public about Hubbard, a public figure who sought public attention, albeit on his own terms; the book quotes from merely a small portion of Hubbard's works and from only those that have been published; and, it will cause no adverse impact protected by the copyright law on the market for Hubbard's writings. In these circumstances, we conclude that the book's use of passages from Hubbard's work is protected fair use.

2. *HCO Manual of Justice*

On its cross-appeal, appellee argues that the district court erred in ruling that the *HCO Manual of Justice*—18 passages from which are quoted in the book—had been published in 1959 and that its copyright had expired. Appellee asserts that the *HCO Manual* was subject only to "limited" publication in 1959; that the copyright notice appearing in the work— "COPYRIGHT (C) 1959 by L. Ron Hubbard All Rights Reserved"—was incorrect and superfluous because the book was not published; and that the book did not come under federal copyright protection until January 1, 1978, the effective date of the 1976 Copyright Act.

We are not persuaded by these arguments, which, according to appellant, were not raised below. The district court's finding that the *HCO Manual* was published in 1959 is supported by evidence placed in the record by appellee itself, in particular, an affidavit stating, among other things, that the *HCO Manual* was published. Although appellant argues that this was a simple error caused by the speedy nature of the proceedings below, this assertion cannot properly be raised for the first time in this court.

Since the *HCO Manual* was published in 1959, there is no question that its copyright expired in 1987. Under 17 U.S.C. § 304(a), any copyright that was in its first term on January 1, 1978 "shall endure for twenty-eight years from the date it was originally secured." The date that the copyright of the *HCO Manual* was "originally secured"

is governed by the provisions of the 1909 Copyright Act. See 2 Nimmer on Copyright, § 7.02[C][1], at 7–13 to –14 (1989). Under § 10 of the 1909 Act, an author "secure[d] copyright for his work by publication thereof with the notice of copyright," 1909 Act § 10, reprinted in 1990 supp. to 17 U.S.C.A., at 333, and § 19 of that Act specified that the notice of copyright "shall include also the year in which the copyright was secured by publication." Id. § 19, reprinted in 1990 supp. to 17 U.S. C.A., at 335. Here, the *HCO Manual*'s copyright notice states 1959 as the copyright date; thus, the *HCO Manual*'s copyright lasted for 28 years from 1959, 17 U.S.C. § 304(a), and expired in 1987.

### Conclusion

We hold that each of the four factors of § 107 favors appellant, and that the book's use of quotations from Hubbard's published works was protected fair use. We also hold that the district court did not err in finding that the copyright on the *HCO Manual* expired in 1987. We thus reverse the judgment of the district court, except to the extent it concludes that the copyright on the *HCO Manual* expired in 1987, as to which we affirm.