Ellen **WRIGHT**, Plaintiff,

v.

**WARNER BOOKS, INC.** and Margaret Walker, a/k/a Margaret Walker Alexander, Defendants.

**No. 89 Civ. 3075 (JMW).**

United States District Court, S.D. New York.

Sept. 19, 1990.

Andres J. Valdespino, Walsh & Valdespino, New York City, for plaintiff.

Robert M. Callagy, Mark A. Fowler, Satterlee Stephens Burke & Burke, New York City, for defendants.

## OPINION AND ORDER

WALKER, Circuit Judge:[1]

This case presents the next chapter in the continuing narrative of this Circuit's treatment of the fair use defense to a charge of copyright infringement. The parties have cross-moved for summary judgment on this claim. For the reasons

set forth below, defendants' motion is granted. In addition, defendants have moved for summary judgment on plaintiff's breach of contract and libel claims. The court grants the motion with respect to the contract claim. The libel claim is dismissed without prejudice for want of jurisdiction.

In keeping with familiar legal principles, on the motions for summary judgment made pursuant to Fed.R.Civ.P. 56, the court will resolve all ambiguities and draw all reasonable inferences against the moving party in whose favor it finds. *See, e.g., Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

## BACKGROUND

In 1988, defendant Warner Books, Inc. ("Warner") published a biography entitled *Richard Wright Daemonic Genius,* written by defendant Dr. Margaret Walker. The book examines the life and career of the writer Richard Wright, whose acclaimed works include *Native Son* and *Black Boy.* Wright died in 1960. The novelist's widow, plaintiff Ellen Wright, who holds the copyrights to the published and unpublished works of her late husband, now claims that the book's use of certain published and unpublished materials written by Wright infringes her copyrights.

At the heart of this suit stand a series of unpublished letters Wright sent Walker during the late 1930s. Plaintiff also challenges the use of passages from additional works she deems unpublished as well, including Wright's journals, Wright's letters to his translator Margrit de Sabloniere, and the essay "I Choose Exile." Finally, plaintiff challenges the use of passages from indisputably published works that include *Black Boy, Native Son,* and *Pagan Spain,* a now out of print autobiographical account of Wright's travels through Spain.

At the outset, it bears stating that the court has, of course, reviewed the extensive submitted materials and has read de-

---

1. Sitting by designation.

fendant Walker's biography of Wright, paying particular attention to those passages quoted from the novelist's published and unpublished works.

## DISCUSSION

Plaintiff claims that defendants' use of certain copyrighted materials constitutes infringement under Title 17, United States Code, governing protection of copyrights in original works of authorship. Under 17 U.S.C. § 106, the copyright owner has the exclusive right to reproduce the copyrighted work and to prepare derivative works based on the copyrighted work, and to authorize others to do so. Section 106 is expressly made subject to 17 U.S.C. § 107, however, which provides that "the fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching ..., scholarship, or research, is not an infringement of copyright." Defendants contend that their use of the Richard Wright materials at issue constitutes protected fair use.

*A. The Fair Use Defense:*

Section 107 "requires a case-by-case determination whether a particular use is fair." *Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 549, 105 S.Ct. 2218, 2224, 85 L.Ed.2d 588 (1985). Section 107 provides four non-exclusive factors for a court to consider when determining whether a given use is fair. I will discuss each in the context of Walker's biography.

1. Factor one: purpose and character of the use:

■ Section 107 provides that use of copyrighted materials for "purposes such as criticism, ... scholarship, or research, is not infringement of copyright." Biographies in general, and critical biographies in particular, fit "comfortably within" these statutory categories "of uses illustrative of uses that can be fair." *Salinger v. Random House, Inc.,* 811 F.2d 90, 96 (2d Cir.), *petition for reh'g denied,* 818 F.2d 252, *cert. denied,* 484 U.S. 890, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987). There is a strong presumption that if the allegedly infringing work is a biography, factor one

favors the biographer. *New Era Publications International, ApS v. Carol Publishing Group,* 904 F.2d 152, 156 (2d Cir. 1990) (*"New Era II"*); *New Era Publications International, APS v. Henry Holt & Co.,* 884 F.2d 659, 661 (2d Cir.1989) (Miner, J., concurring), *denying reh'g of,* 873 F.2d 576 (2d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990) (*"New Era I"*).

Notwithstanding plaintiff's attempts to establish the contrary, it cannot be seriously disputed that this first factor favors defendants. Defendants submitted a number of book reviews that praise Walker's book as a serious work of biography and criticism. Regardless of its critical reception in the literary world—and it is not for this court to pass on its literary merits— Walker's book remains, without doubt, a work of criticism and scholarship. On this score, the plaintiff's arguments about Walker's alleged failure to win Mrs. Wright's permission is irrelevant; if defendants' use of Wright's work is fair, then permission from his widow is beside the point.

Factor one favors defendants.

2. Factor two: nature of the copyrighted work:

The occasionally ambiguous publication histories of the works involved in this case require a more extended discussion of this factor than might otherwise be necessary.

■ Whether or not a work is published is critical to its nature under factor two, because "the scope of fair use is narrower with respect to unpublished works." *Harper & Row,* 471 U.S. at 564, 105 S.Ct. at 2232; *see also New Era I,* 873 F.2d at 583; *Salinger,* 811 F.2d at 96. "[E]ven substantial quotations might qualify as fair use in a review of a published work." *Harper & Row,* 471 U.S. at 564, 105 S.Ct. at 2232. The scope of fair use is also greater with respect to factual rather than non-factual works. *New Era II,* 904 F.2d at 157. The former category includes works that are "essentially factual in nature," *Maxtone-Graham v. Burtchaell,* 803 F.2d 1253, 1263 (2d Cir.1986), *cert. denied,* 481 U.S. 1059, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987), or

are "primarily informational rather than creative," *Consumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir.1983), *petition for reh'g denied*, 730 F.2d 47, *cert. denied*, 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984).

▉ The first, and less ambiguous, task is to address the published works at issue. "[B]iographies, of course, are fundamentally personal histories and it is both reasonable and customary for biographers to refer to and utilize earlier works dealing with the subject of the work and occasionally to quote directly from such works." *Maxtone-Graham*, 803 F.2d at 1263 (quoting *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir.1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967)). In almost each case, Walker has quoted roughly from .01% to .34% of the published works. She has quoted roughly 1% of *Pagan Spain*, which is no longer in print. I have little trouble concluding that such limited use of previously published works is fair, particularly where, as here, they are used more for primarily informational, rather than creative purposes. *See Consumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d at 1049. Where Walker has adopted Wright's previously published creative expression she has done so precisely to demonstrate its creativity, not simply to enliven her text. *Cf. Salinger*, 811 F.2d at 96. She has used such expression to help provide substance to her literary critique of an artist, not to report facts in a poetic style that might remain beyond her reach, or for that matter the reach of any biographer. It would be hard to imagine reading a piece of literary criticism that could not quote even the relatively minimal passages quoted by Walker. A critic does not make her arguments or observations in a vacuum, and could not hope to persuade a reader of the correctness of her perceptions without reference to the very works at issue.

With respect to the indisputably published works, factor two favors defendants.

There remains some disagreement over the publication status of the next group of works. Plaintiff originally claimed that three paraphrased portions and one directly quoted passage from Wright's letters to his translator Margrit de Sabloniere, the essay "I Choose Exile," and 14 paraphrased passages from Wright's journals were all unpublished and, given the Supreme Court's holding in *Harper & Row*, 471 U.S. at 564, 105 S.Ct. at 2232—"The fact that a work is unpublished is a critical element of its 'nature' "—factor two favored a finding of infringement. But by summarily asserting that these works were "unpublished," *see, e.g.*, First Wright Aff. ¶ 4, plaintiff ignored certain salient facts, chief among them this: a considerable amount of what she claims has never been published has, in fact, been published.

Thus, after defendants provided references to passages in an authorized biography of Wright written by Michel Fabre (*The Unfinished Quest of Richard Wright*) and a critical examination by Constance Webb (*Richard Wright*), plaintiff revised her earlier position. She now concedes that two of the de Sabloniere passages have been "previously published in their entirety." Second Wright Aff. ¶ 6. She also now admits that "the first sentence of [a third] entry was also previously published." *Id.* Her concession notwithstanding, Mrs. Wright still presses her case: "In any event, reclassification of those [works] to 'published' status does not change the basic premise: defendant did not have permission to quote or paraphrase from them." *Id.* ¶ 5. Of course, her observation only begs the question: if Walker's paraphrased use of the letters is fair, then permission was not necessary. The only passage from a previously unpublished de Sabloniere letter used by Walker is paraphrased solely to convey the most basic and banal factual matter.[2]

---

2. Thus, the March 19, 1960 letter: "Ellen, Julia and Rachel will be in Tuesday; they'll stay for two days ... Don't know what will happen when they get here. I'm hoping for peace and quiet."

Dr. Walker's version: "Early in 1960, Wright wrote to Margrit de Sabloniere that Ellen, Julia and Rachel would be arriving for a two or three day visit. Wright said that he did not know

Plaintiff challenges the extremely limited use of primarily published and factual letters to Wright's translator. With respect to the de Sabloniere letters, factor two favors defendants.

 Walker has paraphrased no more than 56 words from what Mrs. Wright claims is the "unpublished" essay "I Choose Exile." In an important respect, Mrs. Wright is correct. The essay has never been published in full, and defendants' various arguments—that Wright "intended" the essay to be published and that the essay is available to the public at the Kent State University library—miss the mark. Offering an essay to a magazine only to have it rejected—as *Ebony* magazine apparently did with "I Choose Exile"—does not alter the unpublished status of a manuscript. If it did, this country would have far fewer frustrated writers whose work has never been "published." Similarly, an unpublished work's presence in an academic library, on its own, is not the same thing as publication. For example, the unpublished letters at issue in the *Salinger* case were reviewed by Salinger's biographer at the libraries of Harvard, Princeton, and the University of Texas. *Salinger*, 811 F.2d at 93. While certain portions of the "I Choose Exile" essay have, in fact, appeared in an essay by Michel Fabre in a 1973 collection entitled *Richard Wright: Impressions and Perspectives*, the exact passages used by Walker have not previously appeared in print. This is also true of twelve of the fourteen journal entries. Second Wright Aff. ¶ 5.

 However, the Wright materials are not simply available at University libraries;

they were *sold* to Yale University's Beinecke Library for a considerable sum. The sales contract specifically states that Yale purchased the right to "use the Wright Archive," and the University agreed to restrict access to only one manuscript not at issue here. It seems reasonable to conclude that for the purchase price, and pursuant to the sales contract, the University became free to share Wright's work with interested scholars. In *Salinger*, neither the writer nor the holder of the copyrights had deposited the letters in the academic libraries visited by Hamilton, the novelist's unauthorized biographer. *See Salinger*, 811 F.2d at 93.

 Moreover, the works' status as published or unpublished is just one—albeit a "critical," *Harper & Row*, 471 U.S. at 564, 105 S.Ct. at 2232—aspect for the court to consider when analyzing the second factor listed in § 107. Additional circumstances present here suggest that Walker's use of the works in question is fair. First, she has paraphrased, rather than directly quoted, Wright's work. And second, the paraphrasing by and large involves straightforward factual reportage. While *Salinger*, too, concerned paraphrasing but nonetheless concluded with a finding of infringement, there the Second Circuit confronted attempts not merely to paraphrase factual data but also—and significantly—to adopt creative expression that was distinctly personal. *See, e.g., Salinger*, 811 F.2d at 93 n. 2, 99 n. 5. *See Salinger*, 811 F.2d at 100 ("The facts may be reported. [The] letters contain a number of facts that students of his life and writings will no doubt find of interest, and [the biographer] is entirely free to fashion a biography that reports these facts.").[3]

---

what would happen when they arrived but that he was hoping for peace and quiet."

**3.** To be sure, certain of the passages paraphrased by Walker come close to crossing the line in this regard. For example, in his journal on January 6, 1945, Wright wrote: "Spoke with a Negro poet named Owen Dodson over the phone; he said that he had talked with two or three people who had read the galleys of BLACK BOY; he said that Dr. Locke said that he did not know why Wright wanted to drag up all that old stuff; that I had tossed away good

writing; . . . and that the book made him shiver a little. Well, he needs to shiver a little; life is cold."

Walker paraphrases that passage in this manner: "In 1945, Wright talked with Owen Dodson about *Black Boy*. Dodson told Wright that Alain Locke said that Wright had thrown away good writing and could not see why Wright wouldn't just let things stay buried. According to Dodson, Locke said the book made him shiver. Wright's response was that life was cold."

Again, from Wright's journal, dated February 14, 1945: "The contract for 13 Charles Street

Third, what motivated the Court of Appeals in *Salinger*, at least in part, was concern over J.D. Salinger's right to privacy. *Salinger*, 811 F.2d at 92 ("[Salinger] has not published since 1965 and has chosen to shun all publicity and inquiry concerning his private life."). *See also New Era I*, 873 F.2d at 585 (Oakes, Ch. J., concurring) ("*Salinger* is a decision which, even if rightly decided on its facts, involved underlying, if latent, privacy implications not present here by virtue of [the subject's] death.") Given Wright's death in 1960, those concerns, of course, are absent here.

With respect to the journal entries and the passage from "I Choose Exile," factor two favors neither side overwhelmingly, but on balance, I conclude that it favors defendants.

■ Finally, the court must address a series of letters from Wright to Walker, and a separate letter from Wright to Ben Burns, Wright's friend and the editor at *Ebony* magazine. In this context, it is first important to remember once more what the Second Circuit said in *Salinger*: unpublished works "normally enjoy complete protection against copying any protected *expression*." *Salinger*, 811 F.2d at 97 (emphasis added). The court's admonition compels two conclusions. First, by saying "normally," the court refused to adopt a *per se* rule and left intact its instruction to proceed on a case-by-case basis; and second, the court sought to protect expression, not merely any facts that might be set forth in unpublished materials. Having carefully reviewed the letters in question, and the ways in which Walker has paraphrased them, I conclude, without much difficulty, that Walker has used the letters not to recreate Wright's creative expression, but simply to establish facts necessary to her biography, which often relies on her personal association with the late novelist.

I will not go through each and every allegedly improper use, but nonetheless feel compelled to provide a few examples. In an exhibit attached to her affidavit, Mrs. Wright proffers what she terms an "Unpublished Paraphrase Comparison Chart," which does little to bolster her case. Thus, she quotes Wright to Walker: "I have had no word from the publisher, but I hope to hear before the week is out." In Walker's biography, that passage becomes: "In another letter Wright tells of the progress on his novel *Native Son*, saying he looked forward to hearing from the publisher within the week." Again, from another Wright letter to Walker: "Fight for your rights as a creative writer or get out and function as best as you can." In Walker's biography: "He told me to fight for my rights as a creative writer." In a third letter, Wright to Walker: "I'm no longer with the DW." The allegedly offending passage in Walker's book, as excerpted on the "Unpublished Paraphrase Comparison Chart": "In a letter dated January 19, 1938, Wright told me he was no longer working with the *Daily Worker*." Walker has not impermissibly copied Wright's expression; in fact, were Wright alive today, it is hard to imagine him defending passages such as "I'm no longer with the DW" as representative of his style. Walker has instead made use of historical facts revealed in Wright's letters to her and Burns. And that use alone does not render a reliance on unpublished letters unfair.

Factor two favors defendants with respect to Wright's letters to Walker, insofar

---

was signed on the 13 of February! That's the kind of luck I like! Where's the salt to toss over my shoulder, spit, cross my fingers, and look cross-eyed ... Ha-ha!"

In Walker's biography: "In his journal of 1945, he says the papers were signed on Friday, February 13, and this too made him happy. Where is the bad luck, he questioned. He remembered the old fogey superstition about turning around three times and spitting, and he laughed."

But these more troubling examples are rare. And, as the Court of Appeals recently explained: "[R]easonable people can disagree over how to classify Hubbard's works [as either factual or creative and expressive]. Nevertheless, although some of the quoted passages can accurately be described as expressive—e.g., Hubbard's poetry—our review of the record persuades us that most simply cannot be so characterized." *New Era II*, at 158 (finding use fair in its entirety).

as those letters are used in *Richard Wright Daemonic Genius.*[4]

3. Factor three: volume of quotation:

■ This factor addresses the amount and substantiality of the portion used in relation to the copyrighted work, not to the allegedly infringing work. *Harper & Row,* 471 U.S. at 564–65, 105 S.Ct. at 2232–33. "There are no absolute rules as to how much of a copyrighted work may be copied and still be considered a fair use." *Maxtone-Graham,* 803 F.2d at 1263. The third factor includes "both a quantitative and a qualitative component," *New Era II,* at 158, and can favor the copyright holder either when a substantial percentage of the copyrighted work is used, or where the quoted material was " 'essentially the heart of' " the copyrighted work. *Harper & Row,* 471 U.S. at 565, 105 S.Ct. at 2233 (quoting the district court, 557 F.Supp. at 1072).

In each case, the amount used by Walker represents no more than 1%—in the case of *Pagan Spain*—of the work in question, and in most cases, substantially less than that. Moreover, the passages quoted or paraphrased cannot reasonably be seen to represent anything like the central portion of former President Ford's memoir—discussing his decision to pardon his predecessor, Richard Nixon—at issue in the *Harper & Row* decision. Further, the use of *Pagan Spain* must also be seen in light of the work's unavailability on the market. While the Supreme Court has never formally adopted this consideration as one that favors an alleged infringer, it has nonetheless suggested that reference to a work's availability is appropriate. *See Harper & Row,* 471 U.S. at 553, 105 S.Ct. at 2227 (" 'If the work is "out of print" and

unavailable for purchase through normal channels, the user may have more justification for reproducing it.' ") (quoting Senate Report). *See also Maxtone-Graham,* 803 F.2d at 1264 n. 8.

Factor three favors defendants.

4. Factor four: effect on the market:

■ The Supreme Court considers this factor "undoubtedly the single most important element of fair use." *Harper & Row,* 471 U.S. at 566, 105 S.Ct. at 2233. When evaluating the "effect of the use upon the potential market for or value of the copyrighted work," as § 107 dictates, a court must focus on both the market for the work itself and the "harm to the market for derivative works." *Id.* at 568, 105 S.Ct. at 2234. A court must strike a balance "between the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied … [T]he less adverse effect that an alleged infringing use has on the copyright owner's expectation of gain, the less public benefit need be shown to justify the use." *MCA, Inc. v. Wilson,* 677 F.2d 180, 183 (2d Cir.1981) (citations omitted).

With respect to the previously published works, this factor favors defendants. In no way can Walker's minimal quotations from Wright's brilliant novels and autobiographical works serve as a substitute for the books themselves. Plaintiff herself only halfheartedly claims otherwise. As for the passages from unpublished works which are primarily paraphrased by Walker—portions of Wright's journals, portions of his letters to his translator, 56 words from "I Choose Exile," the letters from Wright to Walker—the conclusion is the

---

**4.** While ruling today in favor of defendants, the court cannot accept one of defendants' most repeated arguments—namely, that by sending the letters, Wright necessarily "published" them, or at least "diminished his claim to monopoly rights by voluntarily making his work available to others." Def. Reply Mem. at 10. Sending a letter to a friend, it seems to me, is presumptively a private matter. Thus, it matters little that Wright nowhere advised Walker to keep his letters private, as defendants apparently think was necessary. *See, e.g.,* Walker Aff. ¶ 5

("[Wright] never told me that they were to be kept confidential …"). Absent a statement along the lines of "Please publicize this letter," or "Will you be willing to share my thoughts with any stranger you might encounter?" an unpublished letter remains just that—unpublished, and not intended for publication. No reasonable reading of *Salinger*—which after all dealt with unpublished letters, and a copyright holder who nowhere on those letters warned their recipients to keep them private—supports the open-ended rule defendants propose.

same. First, no one can seriously contend that the relatively slight paraphrasing and even slighter direct quotation at issue here—illustrated best by the mere 56 words from "I Choose Exile" paraphrased by Walker—have adversely affected the market for the essay itself. Second, whatever protections this fourth factor might afford the letters revolves primarily around their worth as creative, expressive documents. To the extent that the letters are creative or expressive—and, as noted previously, this remains, at best, an open question—Walker has done nothing to undermine their value. Instead, she has paraphrased the letters only to report factual data—of a not particularly personal nature—that must remain available to a serious biographer. Third, Walker's book does not target sources of economic profit that might otherwise go to an authorized collection of letters, journal entries or essays. *See, e.g., New Era II*, 904 F.2d at 160; *Salinger*, 811 F.2d at 99 (unpublished letters used and infringing work "copies virtually all of the most interesting passages of the letters."). Fourth, plaintiff has not come forward with the slightest evidence that any harm to any potential market has occurred. *Compare Harper & Row*, 471 U.S. at 567, 105 S.Ct. at 2234. ("The trial court found not merely a potential but an actual effect on the market. [*Time* magazine's] cancellation of its projected serialization and its refusal to pay the $12,500 were the direct effect of the infringement."); *see also Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (the nonmoving party may not rely simply "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."). Fifth, portions of Wright's journals, the essay "I Choose Exile," and even his letters to Walker have already been published and presumably have already secured that section, or at least some part, of the market plaintiff might hope to target.

The fourth fair use factor, like the three before it, favors defendants.

5. Other factors:

Because the factors listed in § 107 "are not meant to be exclusive," *Harper & Row*, 471 U.S. at 560, 105 S.Ct. at 2230, courts also look to such additional considerations as "bad faith by the user of copyrighted material [that] suggests unfairness," *Maxtone–Graham*, 803 F.2d at 1264, or "prejudice suffered by [the alleged infringer] as the result of [the copyright holder's] unreasonable and inexcusable delay in bringing the action". *New Era I*, 873 F.2d at 584. *See also New Era II*, 904 F.2d at 160.

In this context, it bears noting that plaintiff has not been entirely consistent in her actions. In 1973, Michel Fabre published his authorized biography of Wright, *The Unfinished Quest of Richard Wright*. Mrs. Wright made available to Fabre letters written by Walker to Wright, and Fabre quoted passages from those previously unpublished letters. It is undisputed that neither Fabre nor Mrs. Wright ever sought permission from Walker to use those letters. Walker does not complain of this use; rather, as with her use of Wright's letters to her, she says the use was fair. Presumably, Mrs. Wright also believed then that such use was fair. The familiar rule that one who seeks equity must do equity comes to mind.

As noted previously, Wright's death of course removes from this case whatever privacy concerns informed the Second Circuit's opinion in *Salinger*.

Having reviewed plaintiff's submissions and remaining arguments, the court finds no additional factors that suggest unfairness on the part of defendants. Walker's work is a critical biography. Its purpose is to educate the public about a prominent American literary figure, Richard Wright. In the process, the biography quotes a relatively small amount of Wright's published work—a virtually indispensable inclusion in any critical review of a writer—and either quotes or, as is most often the case, paraphrases primarily factual data from unpublished letters and journal entries written by Wright. For the reasons set forth above, the court concludes that Walker's use of

Wright's published and unpublished passages at issue in this case is protected fair use.

### B. The Breach of Contract Claim:

■■ Defendants also move for summary judgment on plaintiff's claim that Walker's use of Wright's works breaches a purported contract between Walker and Yale University's Beinecke Library. Plaintiff claims to be a third-party beneficiary to a library form allegedly signed by Walker. For the purposes of this discussion, the court assumes that Walker did, in fact, sign that form.

The form explains that "[p]ermission to examine manuscripts is *not* an authorization to publish them ... [The applicant] agree[s] to comply with [the relevant rules], including the requirement that Yale University Library manuscripts may not be published in whole or in part unless such publication is specifically authorized." First Wright Aff., Exh. U. This claim addresses primarily Walker's use of Wright's journals, which she paraphrases.

I conclude, as a matter of law, that Walker's decision to paraphrase facts revealed in certain Wright papers collected in Yale's library is not tantamount to publishing those materials, as that term is envisioned by the agreement at issue. Walker did not quote lengthy passages from the Wright papers at Yale, nor did she adopt—either through direct quotation or close paraphrasing—his creative expression. And that is what the agreement would arguably prohibit. Indeed, any more restrictive interpretation of the agreement on the use of the collected materials would amount to a finding that Yale University sought to prevent the airing of historical facts rather than the unfair exploitation of another's creative imagination or style—a finding at odds with the very purpose of a great university.

Of equal significance, I agree with Judge Leval who reached this same issue in *Salinger,* 650 F.Supp. 413 (S.D.N.Y.1986), *rev'd on other grounds,* 811 F.2d 90 (2d Cir.1987).[5] There, he concluded that

> the intention and scope of [agreements like these] are to protect the literary property interests of the owner and not to give the copyright owner an arbitrary power to block legitimate non-infringing use ... [Restrictions like these] should be understood as applying only to quotations and excerpts *that infringe copyright.* To read them [otherwise] ... would severely inhibit proper, lawful scholarly use and place an arbitrary power in the hands of the copyright owner going far beyond the protection provided by law.

650 F.Supp. at 427. The agreement does not appear to have contemplated the exclusion of fair use by biographers. Assuming, without deciding, that plaintiff's rights are coextensive with those of the University,[6] plaintiff cannot prevail on this claim, because Yale University does not have a contractual right to preclude defendant's use of the writings at issue in this case. In light of this court's finding that the use at issue here is fair, defendants' motion for summary judgment on plaintiff's third-party beneficiary claim is granted.[7]

### CONCLUSION

For the reasons set forth above, the court grants defendants' motion for summary judgment on Count I (copyright infringement), which necessarily requires a dismissal of Count III (requesting a permanent injunction). The court also grants

---

5. Given its reversal of the district court's decision on the fair use grounds, the Circuit Court did not reach this issue in its opinion.

6. This assumption is not necessarily warranted since Yale's rules specifically address what the researcher must do with respect to Yale University, *not* a copyright holder like Mrs. Wright.

7. Given the relatedness of the copyright and contract claims, and the fact that the disposition of the first substantially informs the disposition of the second, the court has addressed them both. Plaintiff's remaining libel claim, however, turns wholly on state law. Since this court has no diversity jurisdiction over the parties—plaintiff is an American citizen domiciled in France, *see* Complaint ¶ 2—the appropriate course is to dismiss plaintiff's libel claim without prejudice.

defendants' motion for summary judgment with respect to Count IV (breach of contract). Plaintiff has voluntarily withdrawn Count II (alleging false designation of origin), and that claim is, accordingly, also dismissed. Finally, the court dismisses without prejudice Count V (libel) for want of jurisdiction.

SO ORDERED.