David **WOJNAROWICZ**, Plaintiff,

v.

**AMERICAN FAMILY ASSOCIATION and Donald E. Wildmon, Defendants.**

**No. 90 Civ. 3457 (WCC).**

United States District Court, S.D. New York.

Aug. 8, 1990.

Kathryn L. Barrett, Jonathan A. Olsoff, Jonathan M. Gutoff, Peter Weiss, David Cole, Center For Constitutional Rights, New York City, for plaintiff.

Lane & Mittendorf, New York City (Thomas A. Harnett, of counsel), Benjamin W. Bull, Phoenix, Ariz., Peggy Coleman, American Family Ass'n, Tupelo, Miss., Larry L. Crain, Ames, Southwort & Crain, Brentwood, Tenn., Joseph Secola, Law Offices of Vincent McCarthy, New Milford, Conn., for defendants.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

Multimedia artist David Wojnarowicz brings this action to enjoin the publication of a pamphlet by defendants American Family Association ("AFA") and Donald E. Wildmon, Executive Director of AFA, and for damages based upon claims of copyright infringement, defamation, and viola-

tions of the Lanham Act and the New York Artists' Authorship Rights Act. During the week before trial, defendants moved to dismiss the action or transfer it to the District of Mississippi on the grounds of lack of personal jurisdiction over defendants and improper venue. At the commencement of the trial on June 25, 1990, the Court denied these motions in an oral ruling from the bench, reserving the right to file a supplemental written opinion.

The expedited non-jury trial merged the evidentiary hearing on plaintiff's motion for preliminary injunction with the trial on the merits pursuant to Rule 65(a)(2), Fed.R. Civ.P. Three witnesses testified at trial: plaintiff, defendant Wildmon and Philip Yenawine, an expert on contemporary art. Having heard and considered the evidence presented at trial, the Court granted plaintiff's motion for a preliminary injunction by an Opinion and Order dated June 28, 1990. Plaintiff also seeks a permanent injunction to halt defendants' distribution of the allegedly violative material, a mandatory injunction requiring defendants to correct their alleged misrepresentations and an award of money damages. Having reviewed the record and considered counsels' post-trial briefs, the Court concludes that plaintiff is entitled to judgment for defendants' violation of New York's Artists' Authorship Rights Act, but plaintiff's claims for copyright infringement, violation of the Lanham Act and defamation must be dismissed. This opinion incorporates the Court's findings of fact and conclusions of law pursuant to Rules 52(a) and 65(d), Fed.R.Civ.P.

## FINDINGS OF FACT

Defendant AFA, formerly known as the National Federation For Decency, was founded in 1977 as a not-for-profit corporation by Donald E. Wildmon. Incorporated under the laws of the state of Mississippi, and headquartered in Tupelo, Mississippi, the AFA has over 60,000 members and approximately 500 local chapters nationwide, including a number in the state of New York. It is chartered for the declared purposes, *inter alia,* of promoting decency in the American society and advancing the Judeo–Christian ethic in America. Defen-

dant Donald E. Wildmon, Executive Director of the AFA, is a citizen of the United States, residing in Tupelo, Mississippi. Since May 1989, the AFA has been actively campaigning against what it characterizes as the subsidization of "offensive" and "blasphemous" art by the National Endowment for the Arts (the "NEA"). Through contributions, it raised $5.2 million dollars in 1989.

Plaintiff, a citizen of the United States, residing in New York, New York, is a multi-media artist, whose work includes paintings, photographs, collages, sculptures, installations, video tapes, films, essays and public performances. A professional artist, plaintiff earns his living by selling his art works, many of which are assertedly directed at bringing attention to the devastation wrought upon the homosexual community by the AIDS epidemic. Plaintiff attempts through his work to expose what he views as the failure of the United States government and public to confront the AIDS epidemic in any meaningful way. To this end, plaintiff's art at times incorporates sexually explicit images for the avowed purpose of shaping community attitudes towards sexuality. As a result, his works have been the subject of controversy and public debate concerning government funding of non-traditional art.

Plaintiff's art works frequently employ groupings of images which are assertedly intended to convey composite messages. The works have received a measure of critical acclaim and have been featured in a number of museum and gallery exhibitions. Plaintiff earned approximately $15,000 from the sale of his art works in 1988, approximately $34,000 in 1989 and $17,000 to date this year.

From January 23, 1990 through March 4, 1990, the University Galleries at Illinois State University, Normal, Illinois, presented a comprehensive exhibition of plaintiff's work, entitled "Tongues of Flame" (the "exhibit"), and published a 128–page catalog (the "catalog") which contained reproductions of over sixty of plaintiff's works, as well as essays by plaintiff and others.

The NEA awarded the University Galleries $15,000 to help pay for the exhibit and the catalog.

Plaintiff is the owner of the copyrights to all of the works displayed in the exhibit and of all of the reproductions of his work that appear in the catalog. The copyrights of the following works were duly registered by plaintiff in the United States Copyright Office on May 11, 1990:

| | |
|---|---|
| ITSOFOMO | Reg. No. 392,862 |
| Rimbaud Series | Reg. No. 392,863 |
| Water | Reg. No. 392,864 |
| Delta Towels | Reg. No. 392,865 |
| Bad Moon Rising | Reg. No. 392,866 |
| Untitled (Genet) | Reg. No. 392,867 |
| Sex Series | Reg. No. 392,868 |

On or about April 12, 1990, the AFA and Wildmon published and distributed throughout the United States, including the Southern District of New York, the AFA pamphlet (the "pamphlet") in an effort to stop public funding by the NEA of art works such as plaintiff's. The pamphlet was mailed to 523 members of Congress, 3,230 Christian leaders, 947 Christian radio stations and 1,578 newspapers, at least twenty-eight of which were located in this district. Without plaintiff's authorization, Wildmon photographically copied fourteen fragments of plaintiff's works which he believed most offensive to the public and reproduced these fragments in the AFA pamphlet. These fourteen images, with three exceptions, explicitly depict sexual acts. The other three images portray Christ with a hypodermic needle inserted in his arm, and two ambiguous scenes which plaintiff represents as respectively depicting an African purification ritual and two men dancing together.

Wildmon wrote the text of the pamphlet, which is entitled "Your Tax Dollars Helped Pay For These 'Works of Art.' " It states in the introductory sentence that "the photographs appearing on this sheet were part of the David Wajnarowicz [sic] 'Tongues of Flame' exhibit catalog." The envelope in which the AFA pamphlet was mailed states that the "[p]hotos enclosed in this envelope were taken from the catalog of the 'Tongues of Flame' exhibit" and is marked "Caution—Contains Extremely Offensive Material."

## CONCLUSIONS OF LAW

■ As stated in the Court's oral ruling from the bench at the start of the trial, jurisdiction and venue are proper in this Court pursuant to 28 U.S.C. §§ 1331, 1332, 1338, 1391 and 1400 in light of defendants' publication and distribution of the AFA pamphlet in this district. Personal jurisdiction over defendants is proper under New York's Civil Practice Law and Rules § 302(a)(2). Wildmon's claim that plaintiff has failed to state any claim against him personally, as distinguished from his capacity as Executive Director of the AFA, is rejected. Wildmon may be held personally liable because plaintiff has proved through the testimony of Wildmon himself that he was personally responsible for the alleged violations. See *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir.1971) (defendant personally liable for infringement if he has "the right and ability to supervise the infringing activity and also has a direct financial interest in such activities"); *Davidson v. Vohann of California, Inc.*, 1988 WL 96016, 1988 U.S. Dist. LEXIS 9394 at 3 (S.D.N.Y. Aug. 22, 1988) (defendant personally liable for infringement if "plaintiff proves that he personally participated in the infringement"); *Lottie Joplin Thomas Trust v. Crown Publishers*, 456 F.Supp. 531, 537 (1977), aff'd, 592 F.2d 651 (2d Cir.1978) ("An individual, including a corporate officer, director or stockholder, who causes a corporate defendant to infringe, or personally participates in the acts constituting the infringement is jointly and severally liable for the infringement.").

## I. New York's Artists' Authorship Rights Act

New York's Artists' Authorship Rights Act, N.Y. Cultural Affairs Law Section 14.-03 (McKinney's Supp.1990), provides, in relevant part, that:

1. [N]o person other than the artist or a person acting with the artist's consent shall knowingly display in a place acces-

sible to the public or publish a work of fine art or limited edition multiple of not more than three hundred copies by that artist or a reproduction thereof in an altered, defaced, mutilated or modified form if the work is displayed, published or reproduced as being the work of the artist, or under circumstances which would reasonable be regarded as being the work of the artist, and damage to the artist's reputation is reasonably likely to result therefrom....

2. (b) The rights created by this subdivision shall exist in addition to any other rights and duties which may now or in the future be applicable.

3. (e) The provisions of this section shall apply only to works of fine art or limited edition multiples of not more than three hundred copies knowingly displayed in a place accessible to the public, published or reproduced in this state.

4. (a) An artist aggrieved under subdivision one or subdivision two of this section shall have a cause of action for legal and injunctive relief.

*A. Preemption*

■ Defendants first argue that this state claim is preempted by federal copyright law. Despite two Southern District cases which assertedly support the position of defendants, *see Tracy v. Skate Key, Inc.,* 697 F.Supp. 748 (S.D.N.Y.1988); *Ronald Litoff, Ltd. v. American Express Co.,* 621 F.Supp. 981 (S.D.N.Y.1985),[1] this Court rules that claims under the New York Artists' Authorship Rights law are not preempted by the federal Copyright Act.

To fall within the preemption provision of the federal copyright act, 17 U.S.C. § 301, "(1) the work in question must be within the subject matter of copyright as defined in 17 U.S.C. sections 102, 103 and (2) the state law created right must be equivalent to any exclusive copyright rights in 17 U.S.C. section 106." *Brignoli v. Balch Hardy and Scheinman, Inc.,* 645 F.Supp. 1201, 1204 (S.D.N.Y.1986). If the

state law provides different rights than are available under the federal law, it is not preempted. As stated in *Mayer v. Josiah Wedgewood & Sons, Ltd.,* 601 F.Supp. 1523, 1535 (S.D.N.Y.1985), "[t]he prevailing test may be referred to as the 'extra element' test." That extra element must change not merely the scope of the action but its nature, so that the state law claim is qualitatively different from a copyright infringement claim. Where the state law violation is predicated upon an act incorporating elements beyond mere copying, the action is qualitatively different and there is no preemption. *Harper & Row, Publishers, Inc. v. Nation Enterprises,* 723 F.2d 195, 200 (2d Cir.1983), *rev'd on other grounds,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). *See, e.g., Brignoli v. Balch Hardy and Scheinman, Inc.,* 645 F.Supp. 1201, 1205 (S.D.N.Y.1986) (allegations of breach of contract as well as unauthorized reproduction precludes preemption); *Gemveto Jewelry Co. v. Jeff Cooper, Inc.,* 613 F.Supp. 1052, 1063–64 (S.D.N.Y. 1985), *vacated on other grounds,* 800 F.2d 256 (Fed.Cir.1986) (allegations of unfair competition in addition to unauthorized reproduction precludes preemption).

Although the rights to reproduce and to produce derivative work are protected by the Copyright Act, section 14.03 of the New York Artists' Authorship Rights Act as amended is indeed qualitatively different than federal copyright law in both its aim and its elements. The state Act endeavors to protect an artist's reputation from the attribution to him of altered, defaced, mutilated or modified works of art. *See* Damich, *The New York Artists' Authorship Rights Act: A Comparative Critique,* 84 Colum.L.Rev. 1734, 1738–39 (1984) ("[I]t may be argued that there is a qualitative difference between New York and federal law, since the state statute aims at protecting the artist's reputation, a species of tort law traditionally reserved to the states."). Moreover, a claim under this statute re-

---

**1.** Both *Ronald Litoff* and *Tracy* involved the preemption of a section of the N.Y. Arts and Cultural Affairs Law concerning only the right of reproduction, a property right expressly

granted in, and thus preempted by the Copyright Act. Neither case concerned a claim that defendant had mutilated an artwork, attributed it to the plaintiff and damaged his reputation.

quires proof of elements not required to prove copyright infringement, namely (a) the artwork must be altered, defaced, mutilated or modified; (b) the altered, defaced, mutilated or modified artwork must be attributed to the artist, or displayed in such circumstances as to be reasonably understood to be his work; and (c) this attribution must be reasonably likely to damage the artist's reputation. *See* Damich, *A Comparative Critique*, 84 Colum.L.Rev. at 1738 ("The right of attribution found in the ... New York statute[ ] would appear sufficiently distinct to escape preemption."). While both plaintiff's state law and copyright claims are based upon the same cropped reproductions contained in the AFA pamphlet, they are qualitatively different and hence there is no preemption.[2]

Defendants further argue for preemption under the United State's Constitution's Supremacy Clause, Article VI, claiming that the statute conflicts with the Copyright Act by prohibiting the exercise of certain rights expressly granted by the Copyright Act. Defendants offer the following two examples:

A direct conflict exists where the artist transfers his artwork together with the copyright to such other person (Mr. X). Mr. X creates a derivative work by altering the artwork and places it on display to the public as the work of the artist, damaging his reputation. The artist's rights under section 14.03 have been violated, yet Mr. X's actions are expressly authorized under the Copyright Act.

The same conflict occurs where the artist transfers his artwork to one person (Mr. Y) and the copyright to another (Mr. Z). Mr. Y may alter or modify the artwork and place it on display to the public as the work of the artist, damaging his reputation. Mr. Z may have no objection to this conduct. The artist, under the New York law, may restrain the conduct even though it is an exercise of a right expressly granted by the Copyright Act. See 17 U.S.C. § 106.

Neither example supports defendants' position. The Court does not agree that the Copyright Act authorizes a copyright owner other than the creator to publish or display an altered work, *attributing that altered work to the original creator*, and defendants have cited no decisions to that effect. Accordingly, this Court concludes that . New York's Artists' Authorship Rights Act does not conflict with the Copyright Act and is not preempted thereby under the Supremacy Clause.

## B. Scope of Act

■ Defendants next argue that the distribution of a photocopy of cropped images extracted from plaintiff's work is not a violation of the statute because it did not alter, deface, mutilate or modify plaintiff's original work. This Court does not agree. A literal reading of section 14.03(1) of the Authorship Rights Act clearly demonstrates that the statute guards against alterations of reproductions as well as of the original works:

1. [N]o person ... shall knowingly display in a place accessible to the public or publish a work of fine art ... *or a reproduction thereof* in an altered, defaced, mutilated or modified form if the work is displayed, published or *repro*

---

**2.** That the Copyright Act does not extend to the rights protected in the New York Statute was recently confirmed on June 5, 1990, when the House of Representatives passed by voice vote a bill that would give visual artists a cause of action for the destruction and mutilation of their works. The bill, H.R. 2690, entitled "Visual Artists Rights Act of 1990," adds a new section 106A to the Copyright Act, enabling artists to sue for infringement of certain "moral rights." If enacted, the statute would provide that "no person is entitled to any such right [as granted by section 106A] or equivalent right in any work of visual art under the common law

or any statutes of any State." *Id.* This amendment to the Copyright Act would arguably preempt state laws such as the New York Artists' Authorship Rights Act which currently provide similar rights, demonstrating that Congress does not currently view the various state "moral rights" laws, including New York's, as preempted by the Copyright Act. On June 28, 1990, the Senate Subcommittee on Patents, Copyrights and Trademarks amended and approved S. 1198, a bill substantially similar to H.R. 2690 although several differences have yet to be resolved.

*duced* as being the work of the artist.[3] *See* Damich, *A Comparative Critique*, 84 Colum.L.Rev. at 1740 ("A more plausible interpretation of the reproduction provision—and one supported by statutory language—is that unfaithful reproductions activate the protection of the statute if publicly displayed so as to damage the reputation of the author of the original."). Moreover, section 14.03(3)(b) of the Act confirms its applicability to altered reproductions of artworks in which no physical change has been made in the original work. That subsection—by which 14.03 is expressly limited—states that:

> In the case of a reproduction, a change that is an ordinary result of the medium of reproduction does not by itself create a violation of subdivision one of this section or a right to disclaim authorship under subdivision two of this section.

Sections 14.03(1) and 14.03(3)(b), read together, suggest that deliberate alterations (such as selective cropping), as distinguished from those that ordinarily result from the reproduction process (such as reduction in overall size or loss of detail), would constitute violations. *See* Damich, *A Comparative Critique*, 84 Colum.L.Rev. at 1740.

Defendants maintain that the statute's legislative history supports their contention that the display or publication envisioned is the altered original or limited edition multiple by a subsequent owner. The New York State Assembly Memorandum in Support of Legislation submitted to the legislature in accordance with Assembly Rules, addressed the purpose of the Act, stating:

> JUSTIFICATION
>
> When a work of fine art is sold in New York, the author loses all rights to that work. There are cases where a work has been altered, mutilated or defaced by the owner without consulting with the creator. This is happening with more fre-

quency, or the fact of occurrence is becoming more publicized, as an increasing number of artworks are in the public eye through publications, art being in public places, and exhibitions. While many civil law countries, such as France, Germany and Italy recognize the artist's lasting attachment to the work, our federal government does not. Only one state, California, acknowledges an artist's authorship rights. American courts, thus far, have rarely ruled in favor of the artist stating in decisions that there is no guidance from state or federal laws (citations omitted).

> This bill would give New York artists grounds to go into court to allow the courts to decide whether the artists' reputation has been damaged when a work is intentionally defaced or mutilated by the owner. It would remedy for New York what John Merryman, a legal scholar who has written comprehensively on the subject, calls an "unworthy and intolerable hiatus in our law."

Assembly Memorandum on Assembly Bill 5052–B. It is evident that the statute was intended to protect the integrity of the original artworks and the artist's limited edition multiples after they were sold or transferred to new owners. The statute prevents the new owner from displaying or publishing and attributing to the creator an altered version of that creator's work. However, nothing in the legislative history suggests that the New York legislature intended to limit the Act's protection to that scenario. To the contrary, because the intent of the bill was to protect not only the integrity of the artwork, but the reputation of the artist,[4] the spirit of the statute is best served by prohibiting the attribution to an artist of a published or publicly displayed altered reproduction of his original artwork. From a photographic reproduction, it cannot be seen whether the altera-

---

**3.** "'Reproduction'" means a copy, in any medium, of a work of fine art, that is displayed or published under circumstances that, reasonably construed, evince an intent that it be taken as a representation of a work of fine art as created by the artist." N.Y.Arts & Cultural Affairs Law § 11.01(16) (McKinney's 1990).

**4.** *See* Damich, *A Comparative Critique*, 84 Colum.L.Rev. at 1741 ("Clearly, the thrust of the New York statute is more toward protection of the artist's reputation than toward protection of the work.").

tion was effected on the original or the copy, and both may cause the same harm to the artist's reputation when the altered version is published with attribution to him. In fact, the mass mailing of an altered photographic reproduction is likely to reach a far greater audience and cause greater harm to the artist than the display of an altered original, which may reach only a limited audience. While this situation may not have been expressly contemplated by the drafters, the wording of the statute literally covers it,[5] and the spirit of the statute would be contravened by it.

Second, this Court rejects defendants' claim that the reproduction and publication of minor, unrepresentative segments of larger works, printed wholly without context, does not constitute an alteration, defacement, mutilation or modification of plaintiff's artworks. By excising and reproducing only small portions of plaintiff's work, defendants have largely reduced plaintiff's multi-imaged works of art to solely sexual images, devoid of any political and artistic context. Extracting fragmentary images from complex, multi-imaged collages clearly alters and modifies such work.

Defendants also contend that their reproductions are not within the scope of the Act because the pamphlet was not publicly displayed or published. The Court finds this contention disingenuous. In the Copyright Act, the definition of "publication" is:

> the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance or display, constitutes publication....

17 U.S.C. § 101. By mailing over 200 pamphlets into the state of New York, thereby transferring ownership, to, among others, entities which it obviously intended to disseminate the pamphlet further,[6] defendants have "published" their reproductions within the meaning of the Copyright Act's definition. Moreover, the Copyright Act provides that to "perform or display a work 'publicly'" means:

> (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of the normal circle of a family and its social acquaintances is gathered; or
>
> (2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

17 U.S.C. § 101. Clearly, defendants communicated by means of a mailing, a form of public display. As the Court explained in previously rejecting defendants' argument after the trial, defendants' communication was not private merely because the pamphlet was mailed to selected individuals at specific locations rather than being exhibited in a museum. Defendants' communication is a public message urging opposition to NEA funding of such art. Because they sought to gain support for their cause through such a massive mailing, they can

---

5. If the words "reproduction thereof" were intended to mean the reproduction of an altered original or limited edition multiple, as defendants maintain, those words would not precede the words "in an altered, defaced, mutilated or modified form" but would have instead followed them.

Defendants' additional contention that even if the words "reproduction thereof" apply to their copies of plaintiff's works, the Act still does not apply because they copied plaintiff's catalogue, not his original artwork, lacks merit. That defendants photographed an *authorized* photograph, instead of the original work, does not exempt their alteration from the statute. To hold otherwise would eviscerate any protection under the Statute once an artist publishes his work in conjunction with an exhibition since someone wanting to alter his work could simply copy from the catalogue rather than the original work.

6. The Stipulated Findings of Fact provide that:

"the AFA Pamphlet was mailed to at least 28 individuals in this district, including John Cardinal O'Connor, three major daily newspapers—The New York Times, The New York Daily News, and the New York Post, and at least one radio station, WMCA."

not now claim that there was no publication or public display.[7]

Defendants next claim that plaintiff has failed to demonstrate that the alteration, modification, defacement or mutilation has caused or is reasonably likely to result in damage to his reputation. Defendants urge that plaintiff's reputation has not been diminished in the eyes of his peers or gallery directors, dealers and potential buyers who determine his livelihood but, to the contrary, the increased exposure and publicity has enhanced his reputation. However, the trial testimony of Philip Yenawine, an expert on contemporary art, employed by the Modern Museum of Art in New York, established that there is a reasonable likelihood that defendants' actions have jeopardized the monetary value of plaintiff's works and impaired plaintiff's professional and personal reputation.

Yenawine testified that because the details in the pamphlet imply that plaintiff's work consists primarily of explicit images of homosexual sex activity, plaintiff's name will be "anathema" to museums. Museums unfamiliar with plaintiff's work, believing the pamphlet to be representative of his work, may fail to review his work, even though many of plaintiff's art works do not contain sexual images. Even museums familiar with plaintiff's work may be reluctant to show his work due to his perceived association with pornography.

Yenawine stated that this self-censorship will have an adverse impact on the value of plaintiff's work; individuals will be less likely to purchase plaintiff's art without the pedigree of museum shows and accompanying reviews. Similarly, defendants' misrepresentation of plaintiff's work may deter persons from attending his shows, which may, in turn, reduce the incentive for galleries and museums to include plaintiff's work in future shows. Additionally, the public may associate plaintiff with only the sexually explicit images which were taken out of his intended political and artistic context, resulting in a reasonable likelihood of harm to his reputation and to the market for his work. Yenawine further testified that although corporations would not have been likely to purchase those works of plaintiff's which contain sexual images, "a great number of [plaintiff's] images ... have no sexual representations whatsoever and deal with all sorts of other kinds of images...."

When comparing the situation of plaintiff with that of either Robert Mapplethorpe or Andre Serrano, whose works have risen in value despite similar controversies, Yenawine testified that the works of Mapplethorpe and Serrano were presented in their entirety so that viewers could judge for themselves the merit of the works, unlike the works of plaintiff which were presented in fragments so that readers of the pamphlet could not fairly judge his works. Yenawine also noted that the reputations of both Mapplethorpe and Serrano were better able to withstand the outcry concerning their work because the controversies arose when, unlike plaintiff, they were well-established as artists and supported by investors who had substantial interest in protecting the value of their investments.

■ Defendants next assert that where the speech involves matters of public concern allegedly injuring the reputation of a public figure, actual malice must be proven to defeat First Amendment protection. While agreeing with the quotations submitted by defendants eloquently extolling the virtues of the First Amendment, this Court cannot agree that the alteration, defacement, mutilation or modification of artwork is protected speech, entitling defendants to immunity where they acted without actual malice. Clearly, the pamphlet contained protectable speech, namely, the protest against the subsidy of "obscene" art, which is entitled to the utmost First

---

7. The Court also rejects defendants' claim that the limitation contained in section 14.03(3)(e) of the statute to "works of fine art ... of not more than 300 copies" precludes application in this case. This language does not refer to the defendants' altered material, as defendants now insist, nor does it refer to plaintiff's catalogue, a compilation of his paintings, essays and interviews, as defendants insisted in their pre-trial briefs. This limitation pertains to those underlying works protected by the statute, in this case, plaintiff's original paintings.

Amendment protection as the "unfettered interchange of ideas for the bringing about of political and social changes deserved by the people." *See New York Times Co. v. Sullivan,* 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). The public display of an altered artwork, falsely attributed to the original artist, however, is not the type of speech or activity that demands protection, because such deception serves no socially useful purpose. The New York Statute does not impede truthful speech, but rather prevents false attribution, requiring only accurate labeling to permit dissemination of the desired message. Such labeling in no way diminishes the force of the message. Defendants remain free to criticize and condemn plaintiff's work if they so choose. They may present incomplete reproductions labeled as such or, alternatively, without attribution of such images to plaintiff. However, they may not present as complete works by plaintiff, selectively cropped versions of his originals.

■ Defendants also charge that the statute is unconstitutional (1) as applied, (2) on its face and (3) under the New York State Constitution. For the following reasons, the Court cannot agree. As stated above, the Artists' Authorship Rights Act does not address a category of speech which is presumptively protected under the First Amendment. The First Amendment does not protect the public display of altered artwork, falsely attributed to the original artist. The public display of an altered reproduction for the purpose of expressing a grievance against the government or simply for the purpose of denouncing a social attitude in which there is no express or reasonably implied attribution to the original artist is altogether unlike the public attribution of an altered reproduction of a work of art to its original artist. While the *former* is protected speech, the latter is not. Accordingly, the First Amendment does not foreclose application of this statute to defendants' pamphlet. Similarly, narrowly tailored injunctive re-

lief preventing only the false attribution to plaintiff of altered reproductions of his work does not constitute an unlawful prior restraint of protected speech.[8]

■ As to defendants' position that the statute is unconstitutionally vague and overbroad, the Court again cannot agree. As explained above, the statute encompasses altered reproductions as well as altered originals and altered limited edition multiples. The statute is not impermissibly vague merely because it requires a determination as to whether damage to an artist's reputation is reasonably likely to result from an alteration and attribution. Defendants cite *Coates v. City of Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), in support of the proposition that a law that turns on the reactions of onlookers is inherently vague. However, that decision is not apposite here. In that case, the ordinance which the Supreme Court ruled impermissibly vague made it a criminal offense for "three or more persons to assemble ... on any of the sidewalks .. and there conduct themselves in a manner annoying to persons passing by...." In looking to the construction given by the state court, the Supreme Court stated that the state court did not indicate upon whose sensitivity a violation depended—the sensitivity of the judge, the jury, the arresting officer, or a hypothetical reasonable man. *Id.* at 613, 91 S.Ct. at 1687. The Court noted that because no standard of conduct was specified in the statute, "men of common intelligence must necessarily guess at its meaning." *Id.* at 614, 91 S.Ct. at 1688. Because the statute presently before the Court states that damage to the artist's reputation must be "reasonably likely" to result, the test is clearly whether a reasonable person would conclude that damage to the artist's reputation is likely. The *Coates* Court, moreover, found in the Ohio prohibition a blatant invitation to discriminatory enforcement against those whose association is "annoying" based on factors unrelated to their sidewalk activity. *Id.* at

---

**8.** It is to no avail to defendants that the New York Constitution provides broader protection for freedom of expression than does the First

Amendment to the U.S. Constitution where, as here, the freedom to attribute to an artist an altered work not his own is not protected.

616, 91 S.Ct. at 1689. The present facts raise no such threat of discrimination.

■ Nor is the statute overly broad. As discussed above, because the statute proscribes only the false attribution to an artist of an altered original, limited edition or reproduction of his work, it does not sweep within its ban speech which is protected by the First Amendment. Nor does it prohibit conduct specifically protected by federal copyright laws, as explained above under the preemption section. By requiring that a plaintiff prove a public showing of an altered version of his work, attributed to him, with a resulting reasonable likelihood of harm to his reputation, the Artists' Authorship Rights Act is sufficiently narrow to meet its aim of protecting artists' reputations as well as the integrity of the artwork for the benefit of both artists and the viewing public.

By attributing the modified images contained in the pamphlet to plaintiff as his works of art, defendants have created a likelihood of damage to his reputation as a serious artist and to his earning potential, and have thereby violated New York's Artists' Authorship Rights Act.

## II. *Violation of the Lanham Act*

After reviewing counsels' pre-trial briefs concerning plaintiff's claim for false designation of origin, in an order announced orally from the bench at the commencement of the trial, the Court dismissed plaintiff's Lanham Act claim:

> So in this situation where the defendants are not selling a product, and certainly not distributing a product in competition with plaintiff, and make no representations except as to the plaintiff's product or art works, Section 43(a) is not applicable.

Until 1988, section 43(a) of the Lanham Act covered only misrepresentations concerning one's own product, and did not apply to disparagement of a competitor's product. *See Fur Information and Fashion Council, Inc. v. E.F. Timme and Son, Inc.*, 501 F.2d 1048, 1051–52, (2d Cir.), *cert.*

*denied,* 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974). However, the Act was amended in 1988 to cover such disparagement.[9] As amended, section 43(a), 15 U.S.C. § 1125(a) (West Supp.1990), provides, in relevant part:

> Any person who, on or in connection with any goods or service, uses in commerce ... any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which—
>
> > (1) is likely to cause confusion, or to cause mistake, or to deceive as to the ... origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

■ Characterized as a remedial statute that should be broadly construed, section 43(a) has been successfully used to combat a wide variety of deceptive commercial practices. *See PPX Enterprises, Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 125 (2d Cir.1984). Its purpose is "the protection of consumers and competitors from a myriad of misrepresentations of products and services in commerce." *Allen v. National Video, Inc.*, 610 F.Supp. 612, 625 (S.D.N.Y. 1985). Notwithstanding that the Act encompasses a broad range of misrepresentations, it is clearly directed only against false representations in connection with the sale of goods or services in interstate commerce. It has never been applied to stifle criticism of the goods or services of another by one, such as a consumer advocate, who is not engaged in marketing or promoting a competitive product or service. Indeed, the legislative history of the amendment crystallizes the coverage of section 43(a):

**9.** Amended Nov. 16, 1988, Pub.L. 100–667, Title I, § 132, 102 Stat. 3946, effective Nov. 16, 1989.

Under this proposed change *only* false or misleading "advertising or promotion" would be actionable, whether it pertained to the advertiser itself or another party. The change would exclude all other misrepresentations from section 43(a) coverage. These others are the type which raise free speech concerns, such as a Consumer Report which reviews and may disparage the quality ... of products, [and] misrepresentations made by interested groups which may arguably disparage a company and its products....

[T]he proposed change in section 43(a) should not be read in any way to limit political speech, consumer or editorial comment, parodies, satires, or other constitutionally protected material.... The section is narrowly drafted to encompass only clearly false and misleading commercial speech.

S. 1883, 101st Cong., 1st Sess., 135 Cong. Rec. 1207, 1217 (April 13, 1989).

■ Every instance of the Lanham Act's far-reaching application has been to practices commercial in nature, involving imitation, misrepresentation, or misappropriation in connection with the sale of goods or services by the defendant. *See, e.g., PPX Enterprises, Inc. v. Audiofidelity, Inc.,* 746 F.2d 120, 125 (2d Cir.1984) (marketing albums purporting to feature artist, but which did not contain such performances); *Dallas Cowboys Cheerleaders, Inc., v. Pussycat Cinema, Ltd.,* 604 F.2d 200 (2d Cir.1979) (misappropriating cheerleader uniform in sexually explicit film); *RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058 (2d Cir.1979) (imitating trade dress of established, competitive punch); *American Home Products, Corp. v. Johnson & Johnson,* 577 F.2d 160 (2d Cir.1978) (presenting false and misleading claims in comparative advertising of analgesics); *Gilliam v. American Broadcasting Cos.,* 538 F.2d 14 (2d Cir.1976) (presenting garbled version of plaintiffs' comedy program to public); *Benson v. Paul Winley Record Sales Corp.,* 452 F.Supp. 516 (S.D.N.Y.1978) (deceptive marketing of old records of newly-successful recording artist). Because the pamphlet was not employed in the "advertising or promotion" of goods or services, plaintiff has failed to satisfy a prerequisite to invocation of the Lanham Act.

### III. Copyright Infringement

■ To prevail in a copyright infringement action, the copyright owner must show (1) ownership of the copyright at issue, and (2) a violation of one of the exclusive rights accorded the copyright owner. *See Hasbro Bradley, Inc. v. Sparkle Toys, Inc.,* 780 F.2d 189, 192 (2d Cir. 1985). Plaintiff is the owner of the copyright in the artworks at issue, each of which was registered in plaintiff's name in the U.S. Copyright Office on May 11, 1990. The certificate of registration constitutes prima facie evidence of the validity and ownership of the copyright. 17 U.S.C. § 410(c) (1982); *Dollcraft Industries v. Well–Made Toy Mfg. Co.,* 479 F.Supp. 1105, 1114 (E.D.N.Y.1978).

By directly copying portions of several of plaintiff's copyrighted artworks, defendants have violated plaintiff's exclusive right "to reproduce the copyrighted work in copies." 17 U.S.C. § 106(1). By editing or cropping plaintiff's artworks and presenting the unauthorized modified version, defendants have additionally violated plaintiff's exclusive right to prepare derivative works. 17 U.S.C. § 106(2).

### A. Fair Use

Defendants raise the affirmative defense that their use of the images in the AFA pamphlet for the clear purpose of criticism and comment on an issue of public concern and for petitioning the government for redress of grievances is protected by the doctrine of "fair use" under 17 U.S.C. § 107. Defendants claim that having voluntarily accepted public funding by the NEA to support publication of his artwork, plaintiff may not prevent the AFA or Wildmon from criticizing that funding.

Described as "the most troublesome in the whole law of copyright," *Dellar v. Samuel Goldwyn, Inc.,* 104 F.2d 661, 662 (2d Cir.1939), the issue of fair use requires an intricate balancing of complex factors.

*See Maxtone–Graham v. Burtchaell,* 803 F.2d 1253, 1255 (2d Cir.1986). As an "equitable rule of reason," application of the fair use doctrine requires a case-by-case analysis. *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 448 n. 31, 104 S.Ct. 774, 792 n. 31, 78 L.Ed.2d 574 (1984); *Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 549, 105 S.Ct. 2218, 2224, 85 L.Ed.2d 588 (1985). The Copyright Act enumerates the following four non-exclusive factors to be considered in determining whether a given use is "fair":

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. For the following reasons, the Court concludes that defendants' use of plaintiff's copyrighted works under the present circumstances is protected.

### 1. Purpose and Character of Use

Criticism and comment are uses expressly recognized by the fair use provision of the Copyright Act and the "most universally recognized in connection with" the defense of fair use. 3 *Nimmer on Copyright,* Sec. 13.05[B], at 13–90.1 (1989). No one disputes that this was defendants' dominant purpose. In addressing the controversial issue of federal funding of contemporary art, the pamphlet is entitled to great protection because the appropriateness of such funding must remain open to vigorous challenge and those who accept federal funds must also accept the right of others to protest such expenditures.

*Maxtone–Graham v. Burtchaell,* 803 F.2d 1253 (2d Cir.1986), a case involving invocation of the fair use defense under somewhat similar circumstances, provides ample guidance to this Court. In that case, an anti-abortion author copied portions of a pro-choice book "to make the case against

abortion." *Id.* at 1260. The Second Circuit Court held that because the purpose of the anti-abortion book was criticism and comment, it fell within the purview of fair use, the purpose of which is to "promote certain productive uses of copyrighted material." *Id.* at 1255. The court noted that "[o]ne need not agree with the merit, methodology, or conclusions of [the second work] to recognize that [defendant] supplied substantial intellectual labor to the [copyrighted work], continually offering his own insights and opinions." *Id.* at 1260. The court also pointed out that an "objective reader ... would never confuse [the second] work with the original nor find that [defendants] intended to supplant [the original] work in the marketplace with his own." *Id.* at 1260. Certainly, those same conclusions may be drawn from the present facts.

Plaintiff claims that it was defendants' misleading distortion of his work in order to make it appear more "offensive" than a true and accurate reproduction renders their criticism outside the scope of the doctrine's protection. While the Second Circuit Court has considered "whether the paraphrasing and copying was done in good faith or with evasive motive," *MCA, Inc. v. Wilson,* 677 F.2d 180, 183 (2d Cir. 1981), and noted that inaccuracies may render an "otherwise 'fair abridgment ... [to be] prejudicial, by mistaking and curtailing the sense of the author,'" *Maxtone–Graham v. Burtchaell,* 803 F.2d at 1261 (quoting *Gyles v. Wilcox,* 2 Atk. 141 (1740)), the threshold of this exception is high. As the Second Circuit Court stated:

> [A]s a judicial body, we consider it highly undesirable to hinge a legal determination solely on the relative truth or accuracy of statements made in the context of debate on a highly volatile social issue (citation omitted). Only where the distortions [are] so deliberate, and so misrepresentative of the original work that *no* person could find them to be the product of mere carelessness would we incline toward rejecting a fair use claim (emphasis added).

*Id.*[10] As explained in the following section concerning defamation, plaintiff has not established defendants' intent to distort plaintiff's work and to represent the fragments as complete composite works of art with sufficient clarity to surmount that threshold. While the pamphlet published by defendants misrepresents the original work, it is clear that reasonable persons could find the distortion to be the product of mere carelessness.

Plaintiff argues that the use of the pamphlet as part of a fund-raising effort creates a presumption against the fairness of the use. *See Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 448–49, 104 S.Ct. 774, 792, 78 L.Ed.2d 574 (1984). It is true that even a minimal level of commercial incentive weighs against a finding of fair use, but whether it controls the final determination depends on the totality of the circumstances. While the publication of the pamphlet involved some economic motivation, "it was first and foremost an essay expressing a certain point of view on the [federal funding] issue." *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1262 (2d Cir.1986). Just as the Second Circuit Court found in that case, this Court believes that here defendants' dominant objective was to oppose federal funding of "pornography," and that this objective far outweighed the secondary fund-raising purpose. Accordingly, this factor strongly favors defendants.

### 2. Nature of the Copyrighted Work

All the works from which defendants copied had been published in the catalogue. Whether or not a work is published is critical to its nature under this factor because, as the Supreme Court has stated and the Second Circuit Court has reiterated, "even substantial quotations might qualify as fair use in a review of a published work." *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 564, 105 S.Ct. 2218, 2232, 85 L.Ed.2d 588 (1985); *New Era Publications Int'l v. Carol Publishing Group*, 904 F.2d 152, 157 (2d Cir.1990).

Next considered under factor two is whether the copyrighted work is "informational" or "creative." *See New Era Publications Int'l v. Carol Publishing Group*, 904 F.2d at 157. When informational works are involved, as opposed to creative ones, the scope of fair use is greater. *See Harper v. Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. at 563, 105 S.Ct. at 2232 ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy."); *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. at 455 n. 40, 104 S.Ct. at 795 n. 40 ("Copying a news broadcast may have a stronger claim to fair use than copying a motion picture."). Despite defendants' assertion and plaintiff's admission that plaintiff's works seek to convey political information, the Court finds that the works are primarily creative expressions; they are no less creative because they espouse a political message. Therefore, the scope of fair use is diminished and, even though the works were published, this factor slightly favors plaintiff.

### 3. Volume of the Taking

Analysis of the third factor in the fair use calculus includes consideration of both the amount and the substantiality of the copying. *Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir.), *cert. denied*, 484 U.S. 890, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987). Generally speaking, the greater the amount copied, the less the likelihood that it constitutes fair use. *See New Era Publications Int'l v. Carol Publishing Group*, 904 F.2d at 158; *Salinger v. Random House, Inc.*, 811 F.2d at 98. Similarly, where the copied material extracts "essentially the heart" of the copyrighted work, the likelihood of fair use is diminished. *See Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. at 565, 105 S.Ct. at 2233.

It is not disputed that only small images were excised from plaintiff's works and copied, with the exception of one image which represented an entire photograph

---

**10.** Whether good faith is considered as part of the first fair use factor, as here, or a separate additional factor, the high standard and resulting determination are the same.

from a related series of four.[11] Plaintiff claims, nonetheless, that the quality of the taking was great because, although the pamphlet did not take the heart of his work, it misrepresented his work in a way not possible in literary work. This Court disagrees. To excise and print only the sexual scenes from Lady Chatterly's Lover would depict the work of D.H. Lawrence in substantially the same manner as the pamphlet depicted that of plaintiff. Plaintiff's assertion that the copied images bear no resemblance to the original artwork sounds more in the nature of the claims discussed in the preceding three sections. To the extent that it impacts upon an action for copyright infringement, good faith and misrepresentation may be considered by a court in its analysis of the first factor—the purpose of the copying. Where a plaintiff effectively concedes that it would have been fair use to have copied one of his works in its entirety, he can scarcely base a claim of infringement on the copying of fragments. This factor therefore weighs in favor of defendants.

### 4. Market Effect

Factor four of section 107 concerning the effect on the market for or value of the copyrighted work is the "single most important element of fair use." *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. at 566, 105 S.Ct. at 2233; *New Era Publications Int'l v. Carol Publishing Group*, 904 F.2d at 159. Plaintiff alleges that the harm to his reputation and works has and will continue to diminish the market for and value of his works. Defendants argue that, to the contrary, the value of plaintiff's works has been enhanced by the notoriety surrounding this controversy.

A plaintiff in a copyright action need not show actual harm; it is enough that he demonstrate a likelihood of future harm caused by the infringement. The Supreme Court has indeed articulated that,

> such a requirement [actual harm] would leave the copyright holder with no defense against predictable damage. Nor is it necessary to show with certainty that future harm will result. What is necessary is a showing by a preponderance of the evidence that some meaningful likelihood of future harm exists.

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. at 451, 104 S.Ct. at 793. While the current controversy may have sparked interest in plaintiff's art works, that interest is likely to last only as long as the controversy and is more likely to attract sensation seekers than purchasers. Plaintiff's "fifteen minutes of fame" may not translate into future commercial success.

Defendants more appropriately contend that the fair use doctrine allows publications which criticize and comment to damage the market value of copyrighted work. Under the doctrine, a copyright violation does not occur where even a ruinous review decreases demand for a copyrighted work. *See Consumers Union of United States v. General Signal Corp.*, 724 F.2d 1044, 1051 (2d Cir.1983) (no violation where a "devastating critique had diminished sales by convincing the public that the original work was of poor quality," citing *Dow Jones Co. v. Board of Trade of the City of Chicago*, 546 F.Supp. 113, 121 n. 9 (S.D.N.Y.1982)). Because excerpting a work for criticism and comment does not produce a work in competition with the copyrighted work, the infringing material does not supplant the original work and does not implicate the concerns of the Copyright Act. *See New Era Publications Int'l v. Carol Publishing Group*, 904 F.2d 152, 160

---

**11.** The complaint states that,

Each image in the AFA Pamphlet comprises a very small excised portion of the original work of art from which it is drawn, specifically:

"ITSOFOMO"—only 4.5% of the original work of art is copied.

"Water"—only 2.5% is copied.

"Delta Towels"—only 11% is copied.

"Bad Moon Rising"—only 3.3% is copied.

"Sex Scenes"—7.4% of each of the four photographs of the light in the series, 1.18% of another photograph, and 1.85% of another photograph is copied.

"Untitled (Genet)"—only 16.63% is copied.

Additionally, from the "Rimbaud" Series, only one of the four photographs reproduced in the catalogue is copied.

Complaint, ¶ 19.

(" 'Where the copy does not compete in any way with the original,' copyright's central concern—'that creation will be discouraged if demand can be undercut by copiers'—is absent," citing *Consumers Union of United States v. General Signal Corp.*, 724 F.2d at 1051). Any decrease in sales and popularity due to defendants' criticism and comment is therefore not actionable, especially where, as here, plaintiff's works were published and the infringing pamphlet "will not tap any sources of economic profit that would otherwise go to the authorized [works]." *New Era Publications International v. Carol Publishing Group*, 904 F.2d at 160; *see also* 3 *Nimmer on Copyright*, § 13.05[B], at 13–90.1 to 13–90.3 (1989). Plaintiff's argument that it is the misrepresentative nature of the critique that harmed the value of his work is again inapposite to an infringement claim. This factor therefore strongly favors defendants.

### 5. Other Considerations

Because section 107 contains a non-exclusive list of considerations, additional factors may influence the fair use balance. Defendants first claim that by having accepted tax dollars to support the display of his artwork, plaintiff should be estopped from quieting those taxpayers who seek publicly to criticize such funding. While such claims of estoppel and unclean hands cannot be sustained,[12] it is highly significant to the scope of fair use that plaintiff

accepted public funds to support his artwork. This fact broadens the scope of the fair use exemption because of the strong public interest, protected by the First Amendment, in free criticism of the expenditure of federal funds.

Defendants next contend that because the pamphlet addresses an issue of public concern, it rests "on the highest rung of the hierarchy of First Amendment Values." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982). Defendants similarly argue that the pamphlet falls within the scope of the First Amendment's right to petition government for redress of grievances, a right "among the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers v. Illinois Bar Assoc.*, 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967). The First Amendment, however, provides no privilege against the copyright laws beyond that afforded by the fair use defense. In *Roy Export Co. Establishment v. CBS, Inc.*, 672 F.2d 1095, 1099–1100 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982), the Second Circuit Court held that:

> No circuit that has considered the question, however, has ever held that the First Amendment provides a privilege in the copyright field distinct from the accommodation embodied in the "fair use" doctrine.

---

12. Estoppel is not appropriate is in this case because by exhibiting his works at a show that accepted a $15,000 NEA grant, plaintiff did not thereby forfeit the right to protect his works, most of which were created without the assistance of any government funding. The facts presented demonstrate that defendants cannot establish the requisite factors of the traditional estoppel defense: (1) that the party to be estopped knew the facts of the defendant's infringing conduct; (2) that he intended his conduct to be acted on or acted so that the party asserting the estoppel had a right to believe that it was so intended; (3) that the defendant was ignorant of the true facts; and (4) that he relied on the plaintiff's conduct to his detriment. *See Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 456 F.Supp. 531, 535 (S.D.N.Y.1977), *aff'd*, 592 F.2d 651 (2d Cir.1978).

Unclean hands is equally misplaced because such defense is recognized in a copyright infringement action only where the plaintiff's alleged transgression relates directly to the subject matter of the infringement action, 3 *Nimmer on Copyright* § 13.09[B], at 13–145 (1989), and the defendant has been injured personally by the plaintiff's conduct. *See Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir.1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1277, 63 L.Ed.2d 601 (1980). In *Mitchell Bros. Film Group*, the court concluded that defendants could not raise an unclean hands defense to a claim of copyright infringement on the basis of the alleged obscene content of plaintiff's motion picture, explaining that the plaintiff's alleged wrongdoing "has not changed the equitable relationship between [the parties] and has not injured the defendants in any way." *Id.* The same holds true of the present facts.

The Second Circuit has recently reaffirmed this view, holding that "[o]ur observation that the fair use doctrine encompasses all claims of first amendment in the copyright field ... never has been repudiated." *New Era Publications International v. Henry Holt & Co.*, 873 F.2d 576, 584 (2d Cir.1989). Thus, defendants' copying is protected only to the extent that it constituted a fair use of the copyrighted material. Nonetheless, as stated earlier, the breadth of fair use varies and where vital First Amendment concerns are implicated, as here, that breadth expands and accords greater protection to what might otherwise constitute an infringement. Accordingly, after a balancing all the relevant factors, this Court rules that defendants' use is a fair one.

## IV. Defamation

 Plaintiff claims that in excerpting fragments from plaintiff's original composite art works, defendants removed all the artistic and political content of the works and reduced them to banal sexual images. Plaintiff claims that by attributing the excerpted fragments to plaintiff, defendants defamed his work and damaged his reputation.

To state a claim for libel, plaintiff must demonstrate first that defendants' communication has a defamatory meaning. Because plaintiff concedes that he is a limited purpose public figure, he must also show that defendants acted with "actual malice," that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964); *see Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). While the former requirement is satisfied here, the latter is not, defeating plaintiff's defamation claim.

As the Second Circuit Court has noted, "it is well settled that 'a writing which *tends* to disparage a person in the way of his office profession or trade' is libelous *per se.*" *Davis v. Ross*, 754 F.2d 80, 82 (2d Cir.1985) (quoting *Nichols v. Item Publishers Inc.*, 309 N.Y. 596, 600, 132 N.E.2d 860 (1956) (original emphasis)). As the Court

ruled in its opinion and order issuing a preliminary injunction, the pamphlet is

> likely to mislead reasonable readers into the mistaken belief that the photographic images shown therein represent complete art works of plaintiff David Wojnarowicz, rather than relatively small fragments thereof.

Defendants are not protected by their placement of the phrase "works of art" in quotation marks to identify the phrase as "tongue-in-cheek rhetorical hyperbole." It is clear that defendants' message was serious in nature: plaintiff's works of art were unworthy of NEA funding. Moreover, quotations were used in only four of the fifteen references to plaintiff's work in the pamphlet and its accompanying literature. By presenting what are, standing alone, essentially pornographic images as plaintiff's works of art, without noting that the images are merely details from larger composite works, the pamphlet is libelous *per se*.

"Actual malice" does not require a showing that defendants harbored ill will toward the plaintiff, but rather that defendants had " 'a high degree of awareness of [the communication's] probable falsity,' or ... 'in fact entertained serious doubts as to the truth of [their] publication.' " *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 139 (2d Cir.1984), *cert. denied*, 471 U.S. 1054, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985); *see New York Times Co. v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 725–26. Although actual malice is subjective, *Sharon v. Time Inc.*, 599 F.Supp. 538, 564 (S.D.N.Y.1984), it may be inferred from objective facts, because a defendant will rarely admit that he acted with actual malice. *Bose Corp. v. Consumers Union*, 692 F.2d 189, 196 (1st Cir.1982), *aff'd* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *Gertz v. Robert Welch, Inc.*, 680 F.2d 527 (7th Cir.1982), *cert. denied*, 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983).

Whether Wildmon acted with such reckless disregard of the truth when reproducing only the portions and identifying them as plaintiff's "works of art," while a difficult question, has been illuminated by

his testimony at trial. Wildmon admitted that in selecting the details to be reproduced, he chose those fragments which were most "offensive," that is, apt to arouse the greatest outrage over NEA funding. However, the defamation alleged herein is not over the presentation of the images but the depiction of these images as plaintiff's "works of art."

The Court finds that, in writing the text accompanying the reproductions, Wildmon did not consider that his words could be construed as a representation that the fragments were complete works of art by plaintiff, but merely used the quoted phrase in a sarcastic sense, to indicate that the author did not consider the works deserving of the term "art." And his statements that "the photographs appearing on this sheet were *part of* the David Wajnarowicz [sic] 'Tongues of Flame' exhibit catalog," and that the "[p]hotos enclosed in this envelope were *taken from* the catalog of the 'Tongues of Flame' exhibit ... (emphasis added)," are literally accurate because the photographs were excerpted from the exhibit catalog, even though these statements failed to make clear that those photographs depicted only portions of composite works. Indeed, Wildmon continues to deny that his statements were inaccurate.

While the deliberate omission of qualifying information may demonstrate actual malice, *See Goldman v. Ginzburg*, 414 F.Supp. 324, 326–37 (2d Cir.1968), *cert. denied*, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970); *Westmoreland v. CBS Inc.*, 596 F.Supp. 1170, 1174–74 (S.D.N.Y.1984), the Court is unconvinced that Wildmon knowingly omitted qualifying language that would have rendered his descriptions less misleading. Although Wildmon's statements had the potential to mislead reasonable readers, his actions do not exhibit " 'a high degree of awareness of [the communication's] probable falsity,' or ... [that he] 'in fact entertained serious doubts as to the truth of his publication.' " *Lerman v. Flynt Distrib. Co.*, 745 F.2d at 139; *see*

*New York Times Co. v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 725–26. The Court is unpersuaded by plaintiff's contention that other evidence, including Wildmon's sophistication and repetition of the misstatements after being informed of them by the Chairman of the NEA and this lawsuit, belies his lack of intent. Additionally, Wildmon's knowledge and prior use of the Human Events editorial which referred to the image reproduced therein as a "portion" of a collage does not indicate his conscious decision to substitute such language with more misleading references. As to plaintiff's assertion that the pamphlet implies, contrary to fact, that the exhibit was funded by the NEA after the funding restriction became effective and after John Frohnmayer became the Chairman of the NEA, Wildmon testified that "in [his] mind, if this exhibit took place in March and the law was passed in [the preceding] November ... then it's reasonable to assume that this exhibit contained the kind of material which the law supposedly was to prohibit." The Court believes that Wildmon's state of mind was not sufficiently reckless to satisfy the actual malice requirement for finding defamation against a public figure. Because plaintiff has not proved actual malice with convincing clarity, plaintiff's defamation claim is dismissed.

## V. Remedies

### A. Prohibitive Injunction

New York's Artists' Authorship Rights Act specifically provides for equitable relief. N.Y.Art & Cult.Aff.Law § 14.03(4)(a) (McKinney's Supp.1990). Because plaintiff has demonstrated success on his claim for relief, he is entitled to injunctive relief upon a showing of irreparable injury.[13]

Under similar circumstances, courts have found irreparable injury. In *Benson v. Paul Winley Record Sales*, 452 F.Supp. 516, 518 (S.D.N.Y.1978), for example, the court concluded that plaintiff had demon-

---

**13.** The standard for the issuance of a permanent injunction is essentially the same as that for a preliminary injunction except that for the for-

mer, plaintiff must prove actual success on the merits and irreparable harm.

strated irreparable harm to his professional and personal reputation because the music falsely attributed to him could discourage the public from buying his records in the future. The court also found plaintiff would be irreparably harmed as a result of the misrepresented sexual nature of the Erotic Moods album. It stated:

> The public may further associate Benson with the blatant sexual appeal of the "Erotic Moods" and mistakenly believe that Benson endorses "X Rated" material. Thus defendants ... [have produced] a product that is an anathema to Benson, and a threat to his professional standing and personal stature.

*Id.* Defendants' distribution of a pamphlet, suggesting that plaintiff's work consists of sexually explicit images, has irreparably harmed plaintiff's professional and personal reputation and warrants injunctive relief. Accordingly, defendants and all those in privity with them are hereby enjoined and restrained from further publication or distribution of the pamphlet in controversy. As stated in the Court's opinion and order dated June 28, 1990:

> This injunction shall not prohibit publication or distribution of other pamphlets or materials incorporating the photographic images contained in the pamphlet, or portions thereof, for the purpose of directly or indirectly influencing the National Endowment for the Arts or the United States Congress or other United States government officials to cease the direct or indirect subsidy or support of the creation, exhibition or publication of such art with federal funds, *provided that,* such pamphlets or materials do not suggest to reasonable readers that a fragment of one of plaintiff's art works constitutes the complete work.

### B. Mandatory Injunction

Plaintiff also seeks an order requiring defendants to undertake a corrective mailing and to publish a corrective advertisement in a major daily newspaper. New York's Artists' Authorship Rights Act specifically provides for a right of "disattribution," N.Y.Arts & Cult.Aff.Law § 14.03(2)(a) (McKinney's Supp.1990), and the Court believes it just to require defendants to distribute a corrective communication to all those to whom they sent the original pamphlet. To minimize mailing costs, this corrective communication, to be mailed within ninety days from the date of this opinion and order, may be joined with any other distribution by the defendants. The corrective communication should be submitted to the Court for approval after comment by all parties.

### C. Damages

Under New York's Artists' Authorship Rights Act, an artist is also entitled to legal relief, i.e. damages, for a violation of the Act. N.Y.Art & Cult.Aff.Law § 14.03(4)(a) (McKinney's Supp.1990). Even though plaintiff has established that defendants' actions were reasonably likely to result in damage to his reputation, he has proven no actual damages. So far as the record shows, not one gallery or museum currently scheduled to exhibit plaintiff's work has cancelled; nor has one planned sale been cancelled. Plaintiff presented no evidence that he has been harmed in any other specific, quantifiable way. Accordingly, the Court hereby awards plaintiff nominal damages in the amount of $1.00.

### CONCLUSION

For the reasons discussed above, plaintiff is entitled to judgment for defendants' violation of New York's Artists' Authorship Rights Act. Plaintiff's claims for copyright infringement, violation of the Lanham Act and defamation are dismissed.

SO ORDERED.